442 F.2d 1184
 The AGUA CALIENTE BAND OF MISSION INDIANS, by and through its Tribal Council, et al., Appellants,
v.
The COUNTY OF RIVERSIDE, a political Subdivision of the State of California, Appellee.
 No. 25298.
 United States Court of Appeals, Ninth Circuit.
 May 12, 1971.
 
 1
 Raymond Simpson (argued) of Simpson & Rehkop, Long Beach, Cal., Lewis, Roca, Beauchamp & Linton, Phoenix, Ariz., for appellants.
 
 
 2
 Steven A. Broiles (argued), Deputy County Counsel, Ray T. Sullivan, Jr., County Counsel, Richard J. Lawrence, Deputy County Counsel, Riverside Cal., for appellee.
 
 
 3
 Evelle J. Younger, Cal. Atty. Gen., Ernest P. Goodman, Asst. Atty. Gen., Edward P. Hollingshead, Walter J. Wiesner, Deputy Attys. Gen., Sacramento, Cal., Robert S. Pelcyger, David H. Getches, Escondido, Cal., Minerva Jenkins, Chairman, Tribal Council, Needles, Cal., amicus curiae.
 
 
 4
 Before ELY and WRIGHT, Circuit Judges, and SMITH,* District Judge.
 
 RUSSELL E. SMITH, District Judge:
 
 5
 The Agua Caliente Band of Mission Indians (hereafter The Band),[1] together with individual members of The Band (hereafter the Allottees) appeal from a judgment of the District Court, 306 F. Supp. 279, refusing to enjoin the imposition of the California Possessory Interest Tax[2] on the lessees of the Indian land.
 
 
 6
 The Secretary of the Interior, acting under Congressional authority,[3] allotted to the individual members of The Band and to The Band itself a total of 26,646.28 acres in the area of Palm Springs, California. These lands are interspersed among non-Indian lands in a checkerboard pattern. The legal title to them is in the United States in trust. Of these lands 1250 acres, including eight acres owned by The Band, are under long term leases, made as authorized by 25 U.S.C. Section 415 by the Allottees and The Band with the approval of the Secretary of the Interior. At the time the leases were executed all parties contemplated that the lessees would not be required to pay any taxes by reason of their use and possession of the Indian property.
 
 
 7
 Jurisdiction as to the claims of the Allottees is found in 28 U.S.C. Section 1331, and as to The Band in 28 U.S.C. Section 1331 and Section 1362, unless, as defendants claim, the court is deprived of jurisdiction by 28 U.S.C., Section 1341, which reads: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."
 
 
 8
 This section has been held to be inapplicable to cases involving taxation of instrumentalities of the United States, at least in cases where the United States is a party.[4] Indian property uniformly is said to be an instrumentality of the United States.
 
 
 9
 "Perhaps the most frequent reason stressed by the courts for the exemption of Indian property from State taxation is the Federal Instrumentality doctrine. The doctrine in its application to Indians and Indian property is founded upon the premise that the power and duty of governing and protecting tribal Indians is primarily a Federal function, and that a State cannot impose a tax which will substantially impede or burden the functioning of the Federal Government." Federal Indian Law, Dept. of Int., 1958, page 846.[5]
 
 
 10
 At the instance of the United States, as trustee, State laws taxing Indian property may be contested in the Federal District Court. An Indian, as the beneficial owner of lands held by the United States in trust has a right acting independently of the United States to sue to protect his property interests.[6] The reasons given in United States v. Livingston, supra, for exempting instrumentalities of the United States from the operation of 28 U.S.C. Section 1341 are no less cogent when the right to the exemption is asserted by one who properly could be a co-plaintiff with the United States. We conclude that the District Court did have jurisdiction.
 
 
 11
 The California tax on possessory interests does not purport to tax the land as such, but rather taxes the "full cash value" of the lessee's interest in it.[7] Upon default in payment of the tax the Indian lessor is not liable for payment of it and the Indian's title to the land is not encumbered.[8]
 
 
 12
 A substantial amount of evidence was received bearing upon the economic effects of the tax upon the Indian. We conclude from it what we would conclude without it, that it, a lessee can afford to pay more rent if he is not required to pay a possessory interest tax. If an Indian's land is not subject to that tax he enjoys a better bargaining position than he otherwise would, and hence that the tax has an adverse economic effect upon him.
 
 
 13
 States may not without the consent of Congress tax the property of the United States,[9] nor may they tax instrumentalities of the United States.[10]
 
 
 14
 If the Indian as a beneficial owner of the land, the legal title to which is in the United States, is entitled to no more protection than the United States itself would enjoy, absent a congressional action forbidding the tax, then it is clear that the tax here imposed is valid. In United States v. City of Detroit, supra, (fn. 9) it was held that a tax similar to the California Possessory Interest tax could be levied upon a lessee holding land under a lease from the federal government even though the burden of the tax fell directly upon the United States. If it was not clear before, it is clear since United States v. City of Detroit, supra, that "the imposition of an increased financial burden on the Government does not, by itself, vitiate a state tax" and that the tax imposed upon the use of property is something distinct from a tax imposed upon the property itself. We conclude from this that the tax here is properly imposed unless it can be said that the legislation dealing with Indians and Indian lands demonstrates a congressional purpose to forbid the imposition of it.
 
 
 15
 Here, as in United States v. City of Detroit, supra, there is no statute which expressly forbids the imposition of a state use tax. The statutory law mentioning the taxation of these lands is found in an equalization act[11] and in a statute granting some measure of regulatory power to local governments.[12] If, as was said in United States v. City of Detroit, supra, a tax upon the use of property is not a tax upon the property itself, then there is nothing in these statutes which expressly forbids the tax here imposed.
 
 
 16
 It remains however to determine whether from other legislation dealing with Indians and Indian land a purpose to exempt these allotments from the kind of a tax herein imposed may be found. The law initially authorizing the allotments[13] provides that the land shall be held in trust for the "sole use and benefit" of The Band or Allottees and that at the expiration of the trust period the land shall be transferred "free of all charge and encumbrance whatsoever." This language is identical with the language used in the general allotment Act[14] and in Oklahoma Tax Commission v. Texas Company, 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1949) the Supreme Court refused to imply a tax exemption on the basis of that language. The general rule that tax exemptions are not granted by implication is applicable to taxing acts affecting Indians as it is to all others.[15]
 
 
 17
 The position urged by the Indians here was fully supported by Gillespie v. Oklahoma, 257 U.S. 501, 42 S.Ct. 171, 66 L. Ed. 338 (1922) wherein Mr. Justice Holmes said "A tax on the leases was a tax upon the power to make them and could be used to destroy the power to make them" and "the same considerations that invalidate a tax upon the the leases invalidate a tax upon the profit of the leases, and stopping short of theoretical possibilities, a tax upon such profits is a direct hamper upon the effort of the United States to make the best terms that it can for its wards." That position however was specifically rejected in Oklahoma v. Texas Company, supra, and it is now untenable.
 
 
 18
 Appellants and amicus curiae press upon us the economic plight of the Indians and persuasively attack the concept that a tax upon the use of a thing is not a tax upon the thing itself, but as we see it these arguments are foreclosed by the decisions cited.[16]
 
 
 19
 The judgment appealed from is affirmed.
 
 
 
 Notes:
 
 
 *
 The Honorable Russell E. Smith, Chief Judge of the United States District Court for the District of Montana, sitting by designation
 
 
 [1]
 See 26 Stat. 712, January 12, 1891, 73 Stat. 602, 25 U.S.C. Sections 951-960 (1959)
 
 
 [2]
 "`Possessory interest' means the following:
 (a) Possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person.
 (b) Taxable improvements on tax-exempt land. Except as provided in this section, possessory interests shall not be considered as sufficient security for the payment of any taxes. Leasehold estates for the production of gas, petroleum and other hydrocarbon substances from beneath the surface of the earth, and other rights relating to such substances which constitute incorporeal hereditaments or profits a prendre, are sufficient security for the payment of taxes levied thereon. Such estates and rights shall not be classified as possessory interests, but shall be placed on the secured roll.
 In the event of delinquency in the payment of any installment of taxes on such leasehold estates or rights, they shall be subject to seizure and sale in the same manner as provided for the seizure and sale of possessory interests in Sections 2914 and 2919, inclusive, at any time within three years after the delinquency. Suit may be brought against an assessee of such taxes in the event of delinquency in the payment thereof." California Revenue and Taxation Code, Section 107.
 
 
 [3]
 See footnote 1,supra.
 
 
 [4]
 Department of Employment et al. v. United States et al., 385 U.S. 355, 87 S.Ct. 464, 17 L.Ed.2d 414 (1966), United States v. Livingston, 179 F.Supp. 9 (E.D.S.C.1959), affirmed without opinion 364 U.S. 281, 80 S.Ct. 1611, 4 L.Ed. 2d 1719 (1960). It is to be noted that in one of these cases a public corporation was a co-plaintiff with the United States, and that in the other a private corporation was a co-plaintiff with the United States
 
 
 [5]
 Cited in support: United States v. Rickert, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903); United States v. Pearson, 231 F. 270 (8 Cir. 1916); Dewey County, S.D. v. United States, 26 F. 2d 434 (8 Cir. 1928), cert. den. 278 U.S. 649, 49 S.Ct. 94, 73 L.Ed. 561 (1928); United States v. Thurston County, 143 F. 287 (8 Cir. 1906); United States v. Wright, 53 F.2d 300 (4 Cir. 1931), cert. den. 285 U.S. 539, 52 S.Ct. 312, 76 L.Ed. 932; Morrow v. United States, 243 F. 854 (8 Cir. 1917)
 
 
 [6]
 Poafpybitty v. Skelly Oil Co., 390 U.S. 365, 88 S.Ct. 982, 19 L.Ed.2d 1238 (1968)
 
 
 [7]
 County of Riverside v. Palm-Ramon Development Co., 63 Cal.2d 534, 47 Cal. Rptr. 377, 407 P.2d 289 (1965)
 
 
 [8]
 Cal.Rev. and Taxation Code, Sections 2914-2919, 3003, 3101-3107
 
 
 [9]
 United States v. City of Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958)
 
 
 [10]
 See cases cited in footnotes 4 and 5
 
 
 [11]
 Public Law 86-339, Sept. 21, 1959, 73 Stat. 602, Sec. 5
 "(a) The right to an equalization allotment or to a cash payment in lieu thereof pursuant to section 3, subsection (d), of this Act, shall be transferable by will or descent in the same manner as are trust payments under existing law and shall not be subject to State or Federal inheritance, estate, legacy, or succession taxes.
 (b) A cash payment made in lieu of an equalization allotment pursuant to section 3, subsection (d) of this Act shall not be regarded as income or capital gain for purposes of Federal or State income taxation and shall not, as long as it remains in the form of cash or a bank deposit in the ownership of the allottee, be subject to taxation as personal property."
 
 
 [12]
 28 U.S.C. Section 1360. "(b) Nothing in this section (the one granting the regulatory power) shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein."
 
 
 [13]
 26 Stat. 712 (1891)
 
 
 [14]
 25 U.S.C. Section 348
 
 
 [15]
 Oklahoma Tax Commission v. United States, 319 U.S. 598, 63 S.Ct. 1284, 87 L.Ed. 1612 (1943). Squire v. Capoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956) may point to, although it does not express, a different rule where the taxing power of the United States comes in conflict with the interest of the ward
 
 
 [16]
 California has made no attempt to seize and sell the interest of the lessees in any of the property involved in this action, and it is unnecessary here to touch upon the problem which would be created were the State of California, by some process of seizure and sale, to endeavor to substitute in an Indian lease a new lessee in the absence of the consent of the Indians and of the Secretary
 
 
 ELY, Circuit Judge (dissenting):
 
 20
 I respectfully dissent. The obligation of the federal government to its Indian wards, probably born of a collective national guilt, runs deep. It is federal policy, undeniable, if belated, that the Indian has a special status in our Country and that he is justly entitled to very special protection. I cannot join in stripping such a protection from the Agua Caliente Band in the face of the overwhelming evidence that the tax in question amounts, in its effect, to taxation of the full value of Indian trust lands.
 
 
 21
 It is conceded by all concerned that were Riverside County's possessory interest tax imposed directly on the Indian lands, it would be unlawful. My Brothers, however, feel constrained by United States v. Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424 (1958), to hold that "the tax imposed upon the use of property is something distinct from a tax imposed upon the property itself." They conclude the tax to have been validly imposed absent legislative immunization. They further rely upon Oklahoma Tax Comm'n v. Texas Co., 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1949), to conclude that no such legislative immunization may be implied. I strongly disagree with both conclusions.
 
 
 22
 Detroit simply expressed the view, with which I have no disagreement, that the doctrine of intergovernmental immunity does not preclude state taxation of an entity solely because the burden of such taxation eventually falls on the federal government. If, however, an important federal policy conflicts with the goal of effective implementation of the state taxing power, I should think that the Supremacy Clause demands that the extent to which a state tax burdens the federal policy be an important factor in determining the validity of the tax. There was no such conflict in Detroit. Here, I submit, the conflict is unmistakable, and the burden onerous.
 
 
 23
 Moreover, even if the majority has correctly interpreted Detroit, the local tax here involved was illegal. The Agua Caliente lands were given "for the sole use and benefit" of the Band, to be conveyed at the end of the trust period "free of all charge or encumbrance whatsoever." The land involved in Oklahoma Tax Comm'n was allotted pursuant to a statute containing the same language, and my Brothers construe the opinion in that case as a refusal to imply a tax exemption from the language. But this, I submit, is an incorrect reading of that case. The court in Oklahoma Tax Comm'n was addressing itself primarily to the constitutional status of lessees of government-owned lands, whether Indian trust or otherwise. The lessees in that case sought exemption as federal instrumentalities. "The respondents are `private persons' who seek immunity `for their property or gains because they are engaged in operations under a government contract or lease.'" 336 U.S. at 363, 69 S.Ct. at 572. Since the Indian lessors bore no tax burden, direct or indirect, the lessees were precluded from urging a derivative immunity from the Indian grant. "These cases present no question concerning the immunity of the Indian lands themselves from state taxation. There is no possibility that ultimate liability for the taxes may fall upon the owner of the land." 336 U.S. at 353, 69 S.Ct. at 567 (emphasis supplied). The statutory implication which was rejected in that case was not urged from the Indian grant, but from the fact of the lease itself. No derivative Indian rights were asserted by the non-Indian lessees, and no Indian was a party to the action. Indeed, the crucial language of the statute was not discussed, or even mentioned!
 
 
 24
 Underscoring the limited relevance of Oklahoma Tax Comm'n is Squire v. Capoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956). There, the Supreme Court, fulfilling a "clear `duty to secure to the Indians all that by any fair construction of treaty or statute can be held to have been understood by them or intended by Congress[,] Minnesota v. Hitchcock, 185 U.S. 373, 402, 22 S.Ct. 650, 46 L.Ed. 954 (1902),'" actually did construe the "charge or encumbrance" language alleged to have been at issue in Oklahoma Tax Comm'n. Without reference to the Oklahoma case, the language was construed to include taxation.
 
 
 25
 The majority's footnote 15 gives inadequate expression to the force of Squire. The case did not turn on the difference between state and federal taxation of Indian trust lands. Rather, the case stands for the proposition that the federal policy of protecting Indian wards is superior even to the need to collect revenue for the maintenance of the federal government itself. Surely, we should afford no less protection when the interest of the Indian ward is in conflict with an interest of a State. Some of the States were likely no less responsible than the Nation for alleged depredations of Indian property sometimes said to have caused the creation of federal trust status in the first instance. Cf. Note, 42 S.Cal.L.Rev. 101, 110 n. 42. (1969).
 
 
 26
 I would reverse.