The **FORT MOJAVE TRIBE,** by and through its Tribal Council in Class Action on behalf of all members of said Tribe, Plaintiff-Appellant,

v.

The **COUNTY OF SAN BERNARDINO,** a political subdivision of the State of California, Defendant-Appellee.

No. 75–1485.

United States Court of Appeals, Ninth Circuit.

Sept. 28, 1976.

Raymond C. Simpson (argued), Palos Verdes Estates, Cal., for plaintiff-appellant.

Robert R. Walker, Deputy County Counsel (argued), San Bernardino, Cal., for defendant-appellee.

Before GOODWIN and SNEED, Circuit Judges, and KING,\* District Judge.

SNEED, Circuit Judge:

This case requires us to determine whether a possessory interest tax may be imposed on non-Indian lessees of property held in trust by the United States Government for reservation Indians. Five years ago we held, in *Agua Caliente Band of Mission Indians v. County of Riverside*, 442 F.2d 1184 (9th Cir. 1971), *cert. denied*, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972), that such a tax was valid. The trial judge in the instant case found *Agua Caliente* to be controlling. We continue to support the holding of that case. We consider it proper, however, to look closely at the specific status of the Fort Mojave Indians in deciding whether the rationale of the *Agua Caliente* case should be applied to this situation. Also, it is important to review this area of the law in the light of recent Supreme Court decisions concerning taxation by state and local governments affecting Indians.

## I. *Factual Situation.*

The Fort Mojave Tribe is organized under the provisions of the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U.S.C. §§ 461–479 (hereinafter called the "Act"), unlike the Agua Caliente Band. Thus the Fort Mojave Indians operate under a recognized system of self-government, with a constitution and a business charter which cannot be revoked or surrendered except by Act of Congress. All reservation land is held in trust for the Fort Mojave Tribe as a whole; no individual allotments were ever made under the General Allotment Act of 1887, 25 U.S.C. § 331 et seq.

The Fort Mojave Indians, as part of a plan for the economic development of their reservation, have entered into several 99-year leases with non-Indian lessees. The major development plans include a resort and housing project, as well as the possibility of building a major nuclear power plant. The reservation is located within three states, California, Nevada and Arizona. Since California is the only one of these three states that imposes a possessory interest tax,[1] development of the California section of the reservation may be slowed.[2] The Indians are opposing the California tax because they want to be able to make leasing decisions without regard to the state in which the property is located. The Indians also object to the California tax because they have their own possessory interest tax. They fear that this "double taxation" will further impede development.

## II. *Analytic Framework.*

■ The Supreme Court recently has outlined the general framework by which Indian jurisdiction and taxation cases are to be analyzed. In *McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) the Court states that "the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption." Although the Indian sovereignty doctrine is still relevant,

---

\* Honorable Samuel P. King, United States District Judge for the District of Hawaii, sitting by designation.

1. " 'Possessory interests' means the following:
    (a) Possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person.
    (b) Taxable improvements on tax-exempt land."
   Cal.Rev. & Tax.Code § 107.

2. The economic, as opposed to the legal, incidence of the tax sought to be imposed in this case is uncertain. Under certain assumptions with respect to the demand for the goods and services of the lessee the tax in question will fall entirely on the consumers of these goods and services. Under other assumptions with respect to such demand and with respect to the supply and demand for leasehold interests similar to that here being taxed, the tax in question will fall entirely on the lessee. Other assumptions with respect to these matters will place the burden on the Indians. Which assumptions correspond to the facts is unknown and probably not knowable. In this case, we proceed on the assumption that it is *possible* for the economic burden of the tax, in whole or in part, to fall on the Indians. We know not whether it is *probable* that it will do so.

"because it provides a backdrop against which the applicable treaties and federal statutes must be read," it is no longer the proper major focus of analysis. *McClanahan, supra* at 172, 93 S.Ct. at 1262. Instead we must carefully analyze the applicable federal statutes to determine whether state action has been pre-empted. If not, the state statute need only satisfy the test laid down in *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1958), *viz.* that it not infringe on the rights of reservation Indians to make their own laws and be ruled by them. We turn now to an analysis of the applicable statutes as illumined by recent Supreme Court decisions.

III. *Analysis of Statutes.*

A. The Indian Reorganization Act

The Indians' major argument is that their status as a self-governing tribe organized under the provisions of the Indian Reorganization Act precludes the imposition of this tax by the County of San Bernardino. Section 16 of the Act 25 U.S.C. § 476 provides that "the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers . . . to prevent the sale, disposition, lease or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe." The Indians argue that the imposition of a possessory interest tax on the lessee encumbers their reversionary interest in the land. Alternatively, they argue that the lease itself is an "other asset" of the tribe which is encumbered if subject to taxation. We reject these arguments as going beyond the expressed Congressional intent in enacting the Act to further the achievement of economic independence for the Indians and the establishment of effective systems of tribal self-government. H.R.Rep.No.1804, 73d Cong., 2d Sess. 6 (1934).

■ While the imposition of a possessory interest tax on the leasehold interest will have an economic effect on the Indian lessors, and perhaps, although not certainly, will reduce the amount of rent they will be able to collect the legal incidence of the tax clearly falls on the lessee.[3] The lessor will never be personally liable for any delinquent taxes arising under this taxing statute. *Agua Caliente Band of Mission Indians v. County of Riverside, supra* at 1186. Cal.Rev. & Tax.Code, § 107; *cf. Palm Springs Spa, Inc. v. County of Riverside,* 18 Cal.App.3d 372, 95 Cal.Rptr. 879 (1971). Under these circumstances, there cannot be a direct encumbrance on the lessor's reversionary interest. Similarly, the lease, apart from the lessor's reversionary interest, even if considered an asset of the tribe, is not directly encumbered simply because the amount of the tax is determined by the value of the leasehold. Whatever may be the scope of the indirect burden placed on the lessor's interest in this case, we hold that it is not sufficient to constitute an encumbrance of an "interest in land or other tribal asset."

■ Our conclusion is buttressed by the Supreme Court's decision in *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). There the Court, relying on the statement that section 476 of the Act was designed to encourage tribal enterprises "to enter the white world on a footing of equal competition," 78 Cong.Rec. 11732, found that traditional tax immunities had neither been expanded nor reduced by the Act. *Mescalero, supra* at 153–54 n.9, 93 S.Ct. 1267. Because the court would not imply tax exemptions absent clear statutory guidelines it upheld the imposition of a state tax on the gross receipts of a ski resort operated by the Mescaleros on land located outside the boundaries of their reservation. We follow that lead here and refuse to find that the Act created a tax exemption for non-Indian lessees of Indian land. Congress has given no clear indication that such a result was desired. When such a signal is given, the state and local governments must retreat.

B. Pub.L.No.280

■ We turn to another relevant federal statute. California is one of the five states

---

**3.** *See* n.2, *supra.*

mandated by PL–280 to exercise both civil and criminal jurisdiction over the Indian country within their borders. Thus, both the Agua Caliente Band and the Fort Mojave Tribe are subject to California jurisdiction. Section 4(b) of PL–280, 28 U.S.C. § 1360(b), specifically provides that the grant of civil jurisdiction precludes taxation of "any real or personal property . . . belonging to any Indian or any Indian tribe." We interpreted that language in *Agua Caliente* as not forbidding the imposition of a possessory interest tax on the lessee of Indian property. *Agua Caliente, supra* at 1187.

This holding has been strengthened by the Supreme Court's recent holding that PL–280 left traditional tax immunities intact, despite a transfer of civil jurisdiction to certain states. *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Kirkwood v. Arenas,* 243 F.2d 863 (9th Cir. 1957). We find the Supreme Court decision in *Oklahoma Tax Commission v. Texas Co.,* 336 U.S. 342 (1949) a clear ruling that there was no tax immunity for non-Indian lessees prior to the passage of PL–280. Therefore, PL–280 provides no support for the argument that immunity should be extended to non-Indian lessees of Indian land.

Thus, we see that neither the Act nor PL–280 evidences a Congressional intent to preclude the taxation that is being challenged here. However, we cannot say that PL–280 directly authorizes such taxation. *Bryan v. Itasca County, supra,* forecloses the possibility of such a statement by specifically holding that the PL–280 grant of civil jurisdiction only confers jurisdiction over civil causes of action involving Indians. It is not a general grant of regulatory and taxing power over Indians. This is not, however, fatal to the state's cause. Although *McClanahan, supra,* held that, in the absence of Congressional consent, states are preempted from taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, the court specifically did not deal with "exertions of state sovereignty over non-Indians who undertake activity on Indian reservations." *McClanahan, supra* at 411 U.S. 168, 93 S.Ct. at 1260. When the state action is directed at non-Indians, with only indirect effects on Indians or Indian lands, it is necessary to reconcile the federal preemption rationale with the state's recognized authority to regulate its citizens. *McClanahan, supra* at 179, 93 S.Ct. 1257. Reconciliation requires that state legislation primarily directed at non-Indian lessees of Indian land be considered as not automatically preempted by the federal government in the absence of specific authorization. *See Thomas v. Gay,* 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898); *Utah & Northern R. R. v. Fisher,* 116 U.S. 28, 6 S.Ct. 246, 29 L.Ed. 542 (1885). *Cf. Bryan v. Itasca County, supra,* n.2; *Surplus Trading Co. v. Cook,* 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930). *But cf. Warren Trading Post Co. v. Arizona Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). To permit such non-Indians to enjoy the immunity designed for Indians requires, we believe, a stronger Congressional signal than a statute which neither precludes nor authorizes the taxation in question. This does not contravene the maxim that ambiguous statutes should be construed to benefit Indians. The maxim was never intended to authorize constructions which, on their face, benefit non-Indians handsomely and Indians only marginally, if at all.[4]

### C. The *Williams* Test

The final hurdle facing the county is the test formulated in *Williams v. Lee, supra,* to determine whether a statute not otherwise preempted is valid. The *Williams, supra* 358 U.S. at 220, 79 S.Ct. at 271, case held that "absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws

---

4. The location of ultimate economic benefits and burdens of the tax in question is quite uncertain. *See* n.2, *supra.*

and be ruled by them." The Court in *McClanahan, supra* 411 U.S. at 179, 93 S.Ct. at 1266, specifically recognized that this test is principally applicable in situations involving non-Indians. The court stated: "In these situations, both the tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The *Williams* test was designed to resolve the conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected." In *Williams,* a non-Indian trader licensed by the federal government attempted to collect a debt owed him by an Indian by suing the Indian in state court. The Supreme Court found that allowing Lee to take the Indian into state court would "undermine the authority of the tribal courts over Reservation affairs and would infringe on the right of Indians to govern themselves." *Williams, supra* 358 U.S. at 220, 79 S.Ct. at 272.

■ The interference with Indian self-government in the instant case is much less serious. No Indian or Indian land is being subjected to direct state court process. The only effect of the tax on the Indians will be the indirect one of perhaps reducing the revenues they will receive from the leases as a result of their inability to market a tax exemption. Such an indirect economic burden cannot be said to threaten the self-governing ability of the tribe.

■ The assertion that "double taxation," resulting from the imposition of a tax both by the county and the tribe, impairs the ability of the tribe to levy its tax is not persuasive. There is no improper double taxation here at all, for the taxes are being imposed by two different and distinct taxing authorities. The tribe faces the same problem as other taxing agencies confront when they seek to impose a tax in an area already taxed by another entity having taxing power. We hold that the uncertain economic burden here imposed on the tribe's ability to levy a tax does not interfere with their right of self-government.

Our holding is supported by the recent Supreme Court decision in *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). There the court upheld the validity of a cigarette sales tax on reservation sales to non-Indians, while invalidating the imposition of such a tax on sales to tribe members. When sales were made to non-Indians, the court found that it was "the non-Indian consumer or user who saves the tax and reaps the benefits of the tax exemption." In the instant case an analogous argument can be made. Although the location of the ultimate economic burden of the tax in this case is uncertain, it is possible that the benefits of the exemption would be captured entirely by the non-Indian lessee. It is, of course, also possible that the tribe would capture the entire economic benefit of the exemption. The removal of this possibility appears to us to constitute no more than a "minimal burden" such as in *Moe* was found not to "[frustrates] tribal self-government . . . or [run] afoul of any congressional enactment dealing with the affairs of reservation Indians." *Moe, supra* 425 U.S. at 483, 96 S.Ct. at 1646. *Moe* so held despite the fact that in that case the Indian seller did incur the legal burden of having to collect the tax. In the instant case, there is no legal burden imposed on the Indian lessor at all. In both cases, the Indians incur the possibility of an economic loss. However, the court in *Moe* did not consider that a sufficient burden to invalidate the sales tax as applied to non-Indians making purchases on the reservation. Therefore, we do not find in the instant case a sufficient burden on the tribe's ability to govern itself to justify striking down California's possessory interest tax as applied to non-Indian lessees of Indian land.

## IV. *Enforcement of the Tax as a Direct Encumbrance on the Land.*

The Indians argued both in *Agua Caliente* and the instant case that the procedures available under state law to collect the tax [5] could result in a direct cloud on

---

5.  Cal.Rev. & Tax.Code §§ 2951–2963 (1974).

their title and an unlawful encumbrance on Indian real property. The court in *Agua Caliente, supra* n.16, did not decide this question because it found that no attempt had yet been made to seize and sell any of the interests taxed and therefore the issue was not properly before the court. In the instant case the appellants give details of several situations in which notice of seizure was made and one case in which the sale was advertised before the lessee finally paid the tax. Nonetheless, there have been no completed tax sales and it is highly unlikely that any injuries to Indian rights will occur. The reasons for our confidence with respect to the future are two statutes, 25 U.S.C. § 415 and 25 U.S.C. § 476. The first requires the approval of the Secretary of the Interior of any lease of restricted Indian lands while the second explicitly gives the tribe the right to prevent the lease of tribal lands. We have no reason to believe these statutes will not be invoked to thwart tax sales contrary to the wishes of the Secretary and the Indians.

These statutes, designed to protect Indians, do not render the county powerless to enforce the tax here involved against the lessee. Even if his interest is treated by the assessors as "unsecured property," *i. e.,* property insufficient to secure the payment of the tax, California law permits the seizure and sale of personal property, improvements, and possessory interests of the assessee. Cal.Rev. & Tax.Code § 2951 (1974). California law also permits a direct suit to recover taxes against the owner of unsecured property against which taxes have been assessed. Cal.Rev. & Tax Code, section 3003.[6] This case does not require us to trace out precisely the accommodations which the county and the lessee must make to protect the Indians in the event the lessee defaults in payment of the tax here being challenged. Enough has been said to indicate that we are confident these accommodations are both legal and feasible.

6. For a description of the techniques under California law available to the County to enforce the tax, *see Palm Springs Spa, Inc. v.*

Therefore, the California possessory interest tax is valid as applied to the non-Indian lessees of land within the Fort Mojave Indian Reservation and the judgment of the district court is affirmed.

AFFIRMED.

*County of Riverside,* 18 Cal.App.3d 372, 375–76, 95 Cal.Rptr. 879, 881 (1971).