**PEOPLE OF the STATE OF CALIFORNIA ex rel. CALIFORNIA DEPARTMENT OF FISH AND GAME, Plaintiff,**

v.

**The QUECHAN TRIBE OF INDIANS, Defendant.**

**Civ. No. 76–712–T.**

United States District Court, S. D. California.

Jan. 11, 1977.

Evelle J. Younger, Atty. Gen., of the State of California, by Richard C. Jacobs, Deputy Atty. Gen., San Francisco, Cal., for plaintiff.

Terry L. Singleton, Escondido, Cal., for defendant.

TURRENTINE, District Judge.

## OPINION AND ORDER

The California Department of Fish and Game (Department), on behalf of the People of the State of California, brings an action for declaratory relief against the Quechan Tribe of Indians. The Department seeks a declaration that it can apply California laws regulating fish and game to non-Indians who are permitted to hunt and fish on the Fort Yuma Indian Reservation, and a further declaration that authorized agents—game wardens—be permitted to enter the Reservation for the purpose of enforcing those laws.

The Department and the Quechan Tribe each move for summary judgment. No genuine issue of material fact remains for decision, thus summary judgment is appropriate. F.R.Civ.P., Rule 56(c). This opinion incorporates both findings of fact and conclusions of law. F.R.Civ.P., Rule 52(a). Jurisdiction exists under 28 U.S.C. § 1331(a).

President Chester A. Arthur created the Fort Yuma Indian Reservation by Executive Order January 9, 1884. 1 C. Kappler, Indian Affairs, Laws and Treaties 832 (1903). The reserved lands were transferred to the Department of the Interior to be used for "Indian purposes." *Id.*

The Reservation consists of approximately 8,700 acres located in both Arizona and California. The major portion of the Reservation is located in California, and only this portion is the subject of the present action. Game on the Reservation includes quail, mourning doves, white-winged doves, rabbits as well as some ducks and geese. The most significant species for hunting are the quail and the mourning dove.

The Quechan Tribe of Indians resides on the Reservation, and, having been organized pursuant to the terms of the Wheeler-Howard Indian Reorganization Act of 1934 (25 U.S.C. § 461 *et seq.*), exercises all powers of self-government. Pursuant to these powers the Quechan Tribe adopted a constitution and bylaws which were approved by the Secretary of the Interior and became effective in 1936. *See* 25 U.S.C. § 476. Article XI of the bylaws provides:

The [Quechan Tribal] Council shall pass ordinances for the control of hunting and fishing upon the reservation consistent with Federal laws and applicable game preservation practices.

The Tribal Council has enacted six ordinances under Article XI.

Ordinance QT–4 (1939) requires a non-Indian to obtain a tribal trespass permit which authorizes hunting and fishing on the Reservation. Ordinance 5–60 (1960) declares non-Indian hunting or fishing on the Reservation without a valid tribal trespass permit to be a criminal trespass. A non-Indian trespasser is subject to arrest by a tribal game warden. Ordinance 8–6–64 (1964) adds that a trespasser is to be referred to the appropriate federal authority for prosecution under 18 U.S.C. § 1165. The foregoing ordinances generally required a non-Indian to observe California game laws while on the Reservation. Also, possession of a valid California hunting or fishing license was a prerequisite to the issuance of a tribal trespass permit.

In 1975 the Tribal Council deleted the provisions regarding California game laws in Ordinance QT–1–75, which reads in pertinent part:

[T]he Quechan Tribe recognizes the authority of the State of California to license hunting and fishing within the States [*sic*] jurisdiction but that such State license shall not be necessary for the activities of hunting and fishing on

the Yuma Indian Reservation if any non-member of the Quechan Tribe, intending to engage in such activity, obtains a proper permit to hunt and fish on the reservation.

This ordinance also closed the Reservation to all hunting and fishing by non-Indians.

Ordinance QT–4A (1975) augmented all previous ordinances, establishing guidelines as to the authority of the tribal game warden, empowering him to cite trespassers under 18 U.S.C. § 1165, and establishing procedures for disposition of charges generally. Lastly, Ordinance QT–2–76 (1976) reopened hunting and fishing to non-Indians on the Reservation.

Other than the intermittent opening and closing of the Reservation, the Quechan Tribe imposes no hunting seasons or limits on the quantity of fish or game that can be taken by non-Indians. Presently, hunting and fishing ordinances are enforced by tribal game wardens who are also commissioned as Deputy Special Officers of the Bureau of Indian Affairs, Department of the Interior.

For at least two years before the enactment of Ordinance QT–1–75, the Department not only exercised its jurisdiction over non-Indian hunters and fishermen on the Reservation, but also sent game wardens on the Reservation to enforce the game laws. However, just after the enactment of the ordinance, in July 1975, the Department was advised the Tribal Council would no longer require non-Indians to possess California game licenses. The Department was further advised that the Tribal Council was of the view that it had the exclusive right to regulate hunting and fishing on the Reservation, and that, accordingly, California game wardens would be arrested for trespassing if any attempts to enforce California game laws on the Reservation were made.[1]

---

1. California law provides that it is unlawful to take any fish or bird, except as specifically permitted by law. Calif. Fish & Game Code § 2000. The Department may license the taking of fish or birds. Calif. Fish & Game Code § 1050 *et seq.* Enrolled members of Indian tribes are generally exempt from the provisions of the Fish and Game Code. Calif. Fish & Game Code § 12300. Generally, California's regulation of the hunting of migratory birds of

In respect of the threat of arrests of its game wardens, the Department has elected not to attempt enforcement of the game laws, and those laws have not been enforced since August 1975 on the Fort Yuma Indian Reservation. The present action has been commenced in order that the rights of the parties may be clarified.

Resolution of the question of the applicability of California fish and game laws to non-Indian activities on the Fort Yuma Indian Reservation, depends upon the respective rights and interests of the parties.

■ California has a legitimate interest in regulating the taking of fish and game within its borders. *Bayside Fish Flour Co. v. Gentry,* 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 722 (1936); *Van Camp Sea Food Co., Inc. v. Department of Natural Resources,* 30 F.2d 111 (S.D.Cal.1929).

■ Enrolled members of Indian tribes possess the exclusive right to hunt and fish on reservation lands, where that right has not been expressly relinquished by treaty or other agreement. *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 39 S.Ct. 40, 63 L.Ed. 138 (1918); *Kimball v. Callahan,* 493 F.2d 564 (9th Cir. 1974), *cert. denied,* 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1975); *Confederated Tribes of the Colville Indian Reservation v. State of Washington,* 412 F.Supp. 651 (E.D.Wash.1976), *appeal docketed,* No. 76–3286, 9th Cir., October 27, 1976. This right extends to the Quechan Tribe and the Fort Yuma Indian Reservation. *Quechan Tribe v. Rowe,* 350 F.Supp. 106 (S.D.Cal.1972), *aff'd and remanded,* 531 F.2d 408, 410–411 (9th Cir. 1976).

■ Moreover, Congress has recognized the quasi-sovereign nature of Indians generally, and has enacted legislation whose purpose is to effectuate tribal self-government with the supervisorial aid of the Department of the Interior. 25 U.S.C. § 461

*et seq.*; H.R.Rep. No. 1804, 73d Cong., 2d Sess. 6 (1934); *see Fort Mojave Tribe v. County of San Bernardino,* 543 F.2d 1253, 1256 (9th Cir. 1976).

■ Congress has also enacted 18 U.S.C. § 1165, which proscribes unauthorized entry upon Indian reservations for the purpose of hunting and fishing. Section 1165 reads:

Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more that [*sic*] $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited.

By enacting section 1165, Congress both acknowledged that tribal jurisdiction did not necessarily extend to non-Indians, and sought to remedy the problem by making unauthorized entries a federal crime. *See* S.Rep. No. 1686, 86th Cong., 2d Sess. 2–3 (1960); *Oliphant v. Schlie,* 544 F.2d 1007, 1018–1019 (9th Cir. 1976) (dissenting opinion).

It is pursuant to this legislation that the Quechan Tribe has enacted the series of ordinances summarized previously. Also, it is this legislation upon which the Quechan Tribe bases its contention that it has exclusive right to regulate non-Indian activities on the Reservation. *See Quechan Tribe v. Rowe, supra,* 531 F.2d 408, 410–411 (9th Cir. 1976).

■ Sovereign rights of Indians can be modified or altered by congressional legislation. *United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23

which the mourning dove is an example, is both authorized by and is consistent with federal law in terms of seasons and limits. *See* 16 U.S.C. §§ 703, 706, 708; 50 C.F.R. §§ 20.1, 20.11, 20.11(2), 20.21–25, 20.101–107 (1975).

S.Ct. 216, 47 L.Ed. 299 (1903). One such enactment is Public Law 83–280 (67 Stat. 588 (1953)) (PL 280), which grants to five states, including California, jurisdiction over criminal offenses "committed by or against Indians" in Indian country. 18 U.S.C. § 1162(a).[2] This general grant of criminal jurisdiction is subject to certain exclusions which are embodied in section 1162(b), which reads:

> Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

The principal concern of Congress in enacting PL 280 was Indian lawlessness on reservations generally, including lax federal law enforcement and tribal ineffectiveness in policing the reservations. H.R.Rep. No. 848, 83d Cong., 1st Sess. 1–6 (1953) U.S. Code Cong. & Admin.News 1953, p. 2409; see Goldberg, *Public Law 280: The Limits of State Jurisdiction Over Reservation Indians,* 22 U.C.L.A.L.Rev. 535, 540–544 (1975). Notwithstanding the language of section 1162(b) which purports to reserve to Indians an unconditional right to regulate and con-

trol hunting and fishing on reservations, nothing in the legislative history or the problems occasioning the enactment of PL 280 indicates Congress intended to do more than confer upon certain states limited criminal jurisdiction over crimes by or against *Indians.*

Consistent with the purposes of PL 280, concepts of Indian sovereignty, and federal preemption, the Supreme Court has generally circumscribed closely any state attempt to regulate Indians directly. *See, e. g., Bryan v. Itasca County, Minnesota,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *Antoine v. State of Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *see also Oliphant v. Schlie, supra,* 544 F.2d 1007 (9th Cir. 1976); *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655 (9th Cir. 1975); *but see Puyallup Tribe v. Department of Game of Washington,* 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1967). But, in the context of state regulation of the activities of non-Indians on Indian reservations, the courts have at least acknowledged a state's interest in so regulating, and in some instances have upheld such regulation. *See, e.g., Moe v. Confederated Salish and Kootenai Tribes, supra; Warren Trading Post Co. v. Arizona Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *New York ex rel. Ray v. Martin,* 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261 (1946); *Thomas v. Gay,* 169 U.S. 264, 18 S.Ct. 340, 169 U.S. 264 (1898); *Draper v. United States,* 164 U.S. 240, 17 S.Ct. 107, 41

---

**2.** PL 280 also grants civil jurisdiction over Indians and Indian country. The civil grant is codified at 28 U.S.C. § 1360, which includes exceptions similar to those in 18 U.S.C. § 1162(b). Section 1360(b) reads:

> Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a

restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

L.Ed. 419 (1896); *United States v. McBratney,* 104 U.S. 621, 26 L.Ed. 869 (1882); *Fort Mojave Tribe v. County of San Bernardino, supra,* 543 F.2d 1253 (9th Cir. 1976); *Agua Caliente Band of Mission Indians v. County of Riverside,* 442 F.2d 1184 (9th Cir. 1971), *cert. denied,* 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972); *Confederated Tribes of the Colville Indian Reservation v. State of Washington, supra,* 412 F.Supp. 651 (E.D. Wash.1976); *Donahue v. Justice Court,* 15 Cal.App.3d 557, 93 Cal.Rptr. 310 (1971).

Of principal significance is the recent decision of the Ninth Circuit in *Fort Mojave Tribe v. County of San Bernardino, supra,* 543 F.2d 1253 (9th Cir. 1976). There the court states neither the Wheeler-Howard Indian Reorganization Act of 1934 nor PL 280 can be read to require that the tax immunities [3] possessed by Indians be transferred to or conferred upon non-Indian lessees of reservation lands. The court noted that PL 280 did not authorize a state's taxation of the possessory interest of the non-Indian lessees, but went on to say:

> Reconciliation requires that state legislation primarily directed at non-Indian lessees of Indian land be considered as not automatically preempted by the federal government in the absence of specific authorization. (Citations omitted.)

*Fort Mojave Tribe v. County of San Bernardino, supra,* at 1257. The court went on to hold the imposition of a possessory interest tax on non-Indian lessees of Indian lands was proper under the circumstances, relying upon the decision of the Supreme Court in *Moe v. Confederated Salish and Kootenai Tribes, supra,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). Given the similarity between policies supporting the maintenance of Indian tax immunities and those of preserving the Indian's traditional right to hunt and fish on reserved lands, the analysis evidenced in the tax cases is both analogous and highly persuasive in the present context.

Neither the decision in *Moe* nor that in *Fort Mojave Tribe* involved a discussion of 18 U.S.C. § 1165. Section 1165, when read with the provisions of the Indian Reorganization Act, seems to confer upon Indians the power to grant, withhold or condition non-Indian entry upon reservation lands for the purpose of hunting and fishing. *See Quechan Tribe v. Rowe, supra,* 531 F.2d 408, 410–411 (9th Cir. 1976); Quechan Tribal Bylaws, Art XI.

The parties do not seriously dispute that the Quechan Tribe may preclude non-Indian entry upon the reservation altogether, condition such entry on the purchase or possession of a tribal trespass permit, or impose other conditions which are consistent with federal law. The Quechan Tribe has imposed a condition on entry: the purchase and possession of a tribal trespass permit. Possession of the permit entitles the holder to hunt and fish to the same extent as can a Quechan Tribal member, without need of observing California's fish and game laws, or possessing a valid California license to engage in hunting or fishing.[4] Thus, as to non-migratory game, a non-Indian hunter

---

**3.** PL 280 withholds from its general grant of civil and criminal jurisdiction certain specific subject matters including hunting and fishing, taxation of real or personal property of Indians, and alienation of Indian lands. This evidences the congressional intent in that the United States or the respective tribes maintain exclusive jurisdiction over the specified subject matters. The exclusion of state regulation is characterized as an immunity.

**4.** Congress has enacted legislation whose principal aim is to conserve migratory birds such as mourning or white-winged doves, ducks and geese, all of which are found on the Fort Yuma Indian Reservation. 16 U.S.C. § 703, *et seq.* The regulations promulgated pursuant to these sections establish hunting seasons on a regional basis as well as bag and possession limits on the quantity of game that can be taken. *See, e. g.,* 50 C.F.R. §§ 20.101–20.105. And, in addition, the various states are specifically authorized to enact laws which impose more restrictive seasonal limits. 16 U.S.C. § 708. In view of the direct regulation of Congress, it is doubtful whether a non-Indian is immune from these restrictions even though he hunts on an Indian reservation. Thus, in some respects, the non-Indian hunter cannot hunt to the same extent as can a Quechan Tribal member. The latter is probably immune from these restrictions. *See United States v. Cutler,* 37 F.Supp. 724 (D.Idaho 1941).

may kill game indiscriminately, without regard to numerical limits; he is limited only by the number of shells he elects to shoot and his marksmanship. The effect of allowing a non-Indian permittee to hunt and fish as if he were an enrolled member of the Quechan Tribe is not so much to impose a condition or limitation on entry to the Reservation, as it is an attempt to confer upon a non-Indian entrant those federally secured immunities from state regulation traditionally enjoyed by Indians and safeguarded by the courts. Indeed, other than the possible revenues generated by the sale of trespass permits to hunt or fish where such hunting and fishing is limited by California fish and game laws, it is hard to imagine what, if any, interest of the Quechan Tribe is affected by allowing California to apply its fish and game laws to non-Indians who are authorized to hunt and fish on the Fort Yuma Indian Reservation.

Here, the Department of Fish and Game seeks only the power to regulate and control non-Indian hunting and fishing on the Reservation in a prohibitory manner. That is, the Department seeks a declaration that it may proscribe or limit hunting and fishing activities which have been authorized by the Quechan Tribe, rather than authorize non-Indian activities where the Tribe has prohibited them. The Department acknowledges that the California fish and game laws are directed solely toward the regulation of non-Indian activities insofar as reservation lands are involved. The Department's position is mandated by California Fish and Game Code section 12300, which specifically exempts Indians from the provisions of the Code, subject to exceptions not relevant here.

The attempt by the Quechan Tribe to confer upon non-Indian permittees certain immunities relating to hunting and fishing on the Reservation precisely parallels the attempt by the Fort Mojave Tribe to extend to non-Indian lessees immunity from state taxation. Thus, the reasoning in *Fort Mojave Tribe* applies and compels a similar conclusion here.

■ The court concludes the state regulation sought to be imposed by California is primarily directed toward non-Indians, thus it is not preempted automatically by federal or tribal law, absent specific congressional legislation not here present. *Moe v. Confederated Salish and Kootenai Tribes, supra,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); *Fort Mojave Tribe v. County of San Bernardino, supra,* 543 F.2d 1253 (9th Cir. 1976); *but see, Confederated Tribes of the Colville Indian Reservation v. State of Washington, supra,* 412 F.Supp. 651 (E.D. Wash.1976).

The question becomes whether California's regulation of non-Indian hunting and fishing on the Reservation, not otherwise preempted, infringes upon the Quechan Tribe's right to govern its reserved lands or its members.

In *Williams v. Lee, supra,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1958) the Supreme Court held that an Arizona state court could not entertain a civil action brought by a non-Indian trader against an Indian which arose out of transactions occurring on the Navajo Indian Reservation. The Court stated the test to be employed in the following terms:

> Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them.

*Id.* at 220, 79 S.Ct. at 271. The Court went on to conclude:

> [T]hat to allow the exercise of state jurisdiction here would undermine the authority of tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves.

*Id.,* at 223, 79 S.Ct. at 272.

The *Williams* test applies in the present context. *McClanahan v. Arizona State Tax Commission, supra,* 411 U.S. 164, 179, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Fort Mojave Tribe v. County of San Bernardino, supra,* 543 F.2d 1253 (9th Cir. 1976). In applying the *Williams* test, the Ninth Circuit, in *Fort Mojave Tribe,* states:

The interference with Indian self-government in the instant case is much less serious. No Indian or Indian land is being subjected to direct state court process. The only effect of the tax on the Indians will be the indirect one of perhaps reducing the revenues they will receive from the leases as a result of their inability to market a tax exemption. Such an indirect economic burden cannot be said to threaten the self-governing ability of the tribe.

*Fort Mojave Tribe v. County of San Bernardino, supra,* at 1258. The same conclusion obtains here with one exception.

■■ Application of California fish and game laws to non-Indian on-reservation activities frustrates no significant articulated interest in self-government of the Quechan Tribe. The Tribe has elected not to impose seasons or limits on the taking of fish or game, but instead requires only the purchase of a tribal trespass permit. Thus, the Tribe apparently has no interest in imposing such limitations to conserve game or for any other reason, except perhaps to foster the sale of tribal trespass permits when hunting or fishing would otherwise be prohibited to a non-Indian under California law. The latter interest, if present, is insufficient under *Fort Mojave Tribe* to negate California's interest in applying its laws on the reservation. Since California seeks only the power to apply its more stringent regulations, the former interest is not affected. The economic impact of allowing California to apply its laws is too minimal to require a different result. *Moe v. Confederated Salish and Kootenai Tribes, supra,* 425 U.S. 463, 482, 483, 96 S.Ct. 1634,

48 L.Ed.2d 96 (1976); *Fort Mojave Tribe v. County of San Bernardino, supra,* at 1258–1259 (1976). The same revenues as have been historically available to the Tribe from the sale of permits will continue to be available if California is allowed to apply its fish and game laws, as it has until July 1975. No interference with the Quechan Tribe's right of self-government appears.

While the *Fort Mojave Tribe* decision can be read to require the conclusion that California may apply its fish and game laws to non-Indians who are authorized to hunt and fish on the Fort Yuma Indian Reservation, it does not require that California game wardens be admitted on the Reservation where the Quechan Tribe expressly refuses to grant such admission. As noted previously, the Quechan Tribe has the power to grant, withhold, or condition entry upon the Reservation. Where, as here, the Tribe has expressly decided to refuse entry to state personnel, to overturn that decision is to infringe directly upon the Quechan Tribe's power to govern reservation affairs. *Cf. State of Arizona ex rel. Merrill v. Turtle,* 413 F.2d 683 (9th Cir. 1969). While it may be true, as the Department argues, that the right to apply California laws is meaningless without the concomitant right to enter upon the Reservation to enforce the laws, the Department has not demonstrated a compelling interest necessitating such authority.[5] Moreover, it is possible, notwithstanding the lack of authority to enter the Reservation, except upon express permission of the Quechan Tribe, that the problem may never arise, since at least one California court has indicated that tribal permission to enter a reservation may confer upon a non-Indian a defense to any criminal ac-

---

**5.** No case discussing whether the grant of jurisdiction under PL 280 carries with it the right of a state to send its personnel on a reservation to enforce the laws, has been cited or found. Presumably, such a right exists, otherwise the grant of jurisdiction by PL 280 would have little meaning in light of its purposes. PL 280 exempts jurisdiction over *Indian* hunting and fishing activities on reservations, but does not purport to affect a state's right to regulate its non-Indian citizens. Given the conclusion that California's fish and game laws are not automatically preempted by either congressional

legislation or Tribal enactments, it follows that California can only regulate in a fashion consistent with the dictates of *Williams.* The Quechan Tribe has the (unqualified) power to preclude entry on the Reservation; this power would seem to include any form of entry other than entry inferentially authorized by the grant of jurisdiction under PL 280. This would include both private and state entry. Any ruling to the contrary would run afoul of *Williams,* absent a demonstration of some compelling interest. No such showing has been attempted by the Department.

tion brought under the California Fish and Game Code. *Donahue v. Justice Court, supra,* 15 Cal.App.3d 557, 564, 93 Cal.Rptr. 310 (1971).

 Therefore, it is the conclusion of the court that California may apply, in a prohibitory manner only, the provisions of its Fish and Game Code to non-Indian hunting and fishing activities on the Fort Yuma Indian Reservation, except that enforcement personnel shall not be permitted to enter upon the Reservation to enforce those laws absent express permission of the Quechan Tribe of Indians.

IT IS SO ORDERED.