TRUSCOTT, County Treasurer, v. HURLBUT LAND & CATTLE CO.

(Circuit Court of Appeals, Ninth Circuit. February 3, 1896.)

1. INDIAN RESERVATIONS—JURISDICTION OF TERRITORY AND STATE.

The act of May 26, 1864, organizing the territory of Montana, provides that no lands shall be included therein which, by treaty with any Indian tribe, were not, without its consent, to be included in any territory or state. *Held* that, as there was no treaty existing, at the passage of the act, with any Indian tribe, containing such a provision in respect to the lands constituting the present Crow reservation, that reservation was included in the boundaries and jurisdiction of the territory and state of Montana.

2. SAME—TAXATION OF PERSONAL PROPERTY ON RESERVATION.

The constitution of Montana, in compliance with the conditions of the enabling act (25 Stat. 676), contains, in section 4, subd. 2, a disclaimer of all right to any public lands owned or held by Indian tribes, and provides that, until the Indian title is extinguished, such lands shall remain under the absolute jurisdiction and control of congress. *Held,* that this provision does not prevent the state or its counties from taxing cattle of a corporation grazing upon an Indian reservation under a contract with the Indians which is sanctioned by the United States.

Appeal from the Circuit Court of the United States for the District of Montana.

This was a bill in equity by the Hurlbut Land & Cattle Company to enjoin John S. Truscott, county treasurer of Custer county, Mont., from levying and collecting taxes upon cattle of the corporation which were grazing upon the lands of the Crow Indian reservation. The circuit court granted an injunction as prayed, and the defendant appealed.

Chas. H. Loud and Strevell & Porter, for appellant.

B. P. Carpenter and O. F. Goddard, for appellee.

Before GILBERT and ROSS, Circuit Judges, and MORROW, District Judge.

ROSS, Circuit Judge.    The Crow Indian reservation is within the geographical limits of the county of Custer in the now state of Montana, and the sole question here presented for decision relates to the power of the proper authorities of that county to levy and collect taxes, pursuant to the state laws, upon cattle belonging to an Illinois corporation, and being within the lines of the reservation, grazing upon its lands, under lease from the Indians, ratified and confirmed by act of congress, and for which the Indians are paid, under the direction of the secretary of the interior.

Montana was organized as a territory by an act of congress approved May 26, 1864 (13 Stat. 85), by the first section of which it is provided:

"That nothing in this act contained shall be construed to impair the rights of persons or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with any Indian tribes is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory, but all such territory shall be excepted out of the boundaries and constitute no part of the territory of Montana until such tribe shall certify their assent to the president of the United States to be included within the said territory, or to affect the authority of the government of the United States to make any regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been for the government to make if this act had never been passed."

At the time of the passage of this act of congress organizing the territory of Montana, there existed no treaty between the United States and any Indian tribe prohibiting any part of the present Crow reservation from being included within the territorial limits or jurisdiction of any state or territory, without the consent of such tribe.    It is clear, therefore, that the reservation in question was embraced within the limits of the territory of Montana.    Langford v. Monteith,

102 U. S. 145, 147; Railway Co. v. Fisher, 116 U. S. 28, 6 Sup. Ct. 246. A treaty between the United States and the Crow Indians was, however, entered into May 7, 1868 (15 Stat. 650), by which the United States set apart for the undisturbed use and occupation of those Indians, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit among them, that portion of the territory of Montana—

"Commencing where the 107th degree of longitude west of Greenwich crosses the south boundary of Montana territory; thence, along said 107th meridian to the mid-channel of the Yellowstone river; thence, up said mid-channel of the Yellowstone river to a point where it crosses the said southern boundary of Montana, being the 45th degree of north latitude, and thence east along said parallel to the place of beginning."

The treaty contained the further agreement on the part of the United States that no persons, except those therein designated and authorized so to do, and except such officers, agents, and employés of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the reservation so set apart for the use of the Crow Indians, and also a relinquishment, on the part of those Indians, of all title, claims, or rights in and to any portion of the territory of the United States, except such as is embraced within the limits of the said reservation.

Subsequently, to wit, on the 12th day of June, 1880, a certain agreement was executed by a majority of all the adult male members of the Crow tribe, in conformity with the provisions of article 11 of the treaty of May 7, 1868, agreeing to dispose of and sell to the government of the United States, for certain considerations, a certain part of the Crow reservation, which agreement was ratified by act of congress approved April 11, 1882 (22 Stat. 42), and which agreement, so ratified, contained the provision:

"That, if at any time hereafter, we (the Crow Indians), as a tribe, shall consent to permit cattle to be driven across our reservation, or graze thereon, the secretary of the interior shall fix the amount to be paid by parties so desiring to drive or graze cattle; all moneys arising from this source to be paid to us under such rules and regulations as the secretary of the interior may prescribe."

Certainly, until the territory of Montana became a state, the jurisdiction of the United States over the soil embraced within the limits of the reservation, and over the people who should inhabit it, subject to the provisions of the treaty and of the subsequent agreements with the Crow Indians, was absolute and exclusive.

Prior to the 3d day of March, 1871, the United States always exercised its power and jurisdiction over the Indian tribes by means of treaties; but, on that day, a radical change was made in the pre-existing policy by the enactment of a law which, while continuing unimpaired every obligation of any treaty theretofore lawfully made and ratified with any Indian nation or tribe, declared that thereafter:

"No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty." Rev. St. § 2079.

The territory of Montana became a state under and in pursuance of the act of congress, approved February 22, 1889 (25 Stat. 676), entitled "An act to provide for the division of Dakota into two states, and to enable the people of North Dakota, South Dakota, Montana, and Washington to form constitutions and state governments, and to be admitted into the Union on an equal footing with the original states, and to make donations of public lands to such states." By that act the qualified electors of the then territory of Montana, at an election to be held for the purpose, were authorized to meet in convention to form a constitution and state government for the proposed state of Montana, which constitution should be republican in form, and make no distinction in civil or political rights on account of race or color, except as to Indians not taxed, and which should not be repugnant to the constitution of the United States or the principles of the Declaration of Independence, and which convention should provide by ordinance, among other things, that the people inhabiting the proposed state of Montana—

"Agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that, until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States. * * * But nothing herein or in the ordinances herein provided for shall preclude the said state from taxing, as other lands are taxed, any lands owned or held by any Indian who has severed his tribal relations and has obtained from the United States, or from any person, a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any act of congress containing a provision exempting the lands thus granted from taxation, but said ordinances shall provide that all such lands shall be exempt from taxation by said state so long and to such extent as such act of congress may prescribe."

The act providing for the formation and admission into the Union of the state of Montana contained no other exception of the Crow reservation, or jurisdiction over it, than is found in the foregoing quotation, which provisions were embodied in section 2 of Ordinance No. 1, adopted by the constitutional convention of 1889, in these words:

"Second. That the people inhabiting the said proposed state of Montana do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that, until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States; that the lands belonging to citizens of the United States residing within the said state of Montana shall never be taxed at a higher rate than the land belonging to the residents thereof; that no taxes shall be imposed by the said state of Montana on lands or property therein belonging to or which may hereafter be purchased by the United States or reserved to its use. But nothing herein contained shall preclude the said state of Montana from taxing, as other lands are taxed, any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States, or from any person, a title thereto, by patent or other grant, save and except such lands as have been or may be granted to any Indian or

Indians under any act of congress containing a provision exempting the lands thus granted from taxation, but said last named lands shall be exempt from taxation by said state of Montana so long and to such extent as such act of congress may prescribe."

All of the provisions of the enabling act having been duly complied with on the part of the proposed state of Montana, the state was duly admitted into the Union on an equal footing with the original states, and afterwards the state enacted this statute:

"The sovereignty and jurisdiction of this state extends to all places within its boundaries as established by the constitution, excepting such places as are under the exclusive jurisdiction of the United States; but the extent of such jurisdiction over places that have been or may be ceded to, purchased or condemned by the United States, is qualified by the terms of such cession, or the laws under which purchase or condemnation has been or may be made." Pol. Code Mont. § 40.

By section 41 of the same Code, the legislature of the state declared that all legal processes of the state, whether civil or criminal, may be served upon persons and property found within any of the military reservations or on any Indian reservation in all cases where the United States has not exclusive jurisdiction.

Undoubtedly, so far as concerns the government and protection of the Crow Indians, and for all purposes relating to the treaty and agreements between that tribe and the United States, the reservation in question is within the sole and exclusive jurisdiction of the United States. But is it to be regarded as without the jurisdiction of the state of Montana for all purposes? Clearly not. The people inhabiting the proposed state were required by congress to agree, and did agree, as one of the conditions to its admission into the Union, to disclaim any right or title to all lands lying within the limits of the proposed state owned or held by any Indian or Indian tribes, and that, until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and under the absolute jurisdiction and control of congress. The people inhabiting the proposed state were required to make, and did make, as one of the conditions of its admission into the Union, a similar disclaimer in respect to all right and title to the unappropriated public lands lying within its boundaries. Those, too, remained in the absolute jurisdiction and control of congress for all purposes relating to their control or disposition. The state could not tax or incumber such unappropriated public lands, or otherwise interfere with the jurisdiction and control over them reserved by the United States, but no one, we apprehend, would contend that personal property taken upon them by a third party, whether rightfully or wrongfully, would not be liable to be taxed in the state and county in which it should be found. We are unable to see any good reason why the authority of the state, and its subordinate subdivisions, the counties, may not also include the taxation of all such personal property found within their geographical limits, although upon the reservation in question, provided, as in this case, the Indians are in no way interested in it. The cattle upon which the taxes in question were levied were grazing upon the reservation under lease from the

Crow Indians, the sanction of which by the United States did no violence to the provisions of the treaty between the government and them. They were within the geographical limits of the state of Montana, and of the county of Custer of that state, and were the property, not of the Indians, but of a corporation of the state of Illinois, and were confessedly liable to the taxes levied unless they were without the jurisdiction of the state of Montana. That they were not we consider very clear. What was said by the supreme court in the case entitled Railway Co. v. Fisher, 116 U. S. 28–31, 6 Sup. Ct. 246, in respect to the authority of the then territory of Idaho, to tax that portion of a railroad extending, with the consent of the Indians, through a similar reservation, is applicable to the state of Montana. "The authority of the territory," said the court, "may rightfully extend to all matters not interfering with the protection of the Indians. It has, therefore, been held that process of its courts may run into an Indian reservation of this kind, where the subject-matter is otherwise within their cognizance. If the plaintiff lawfully constructed and now operates a railroad through the reservation, it is not perceived that any just rights of the Indians under the treaty can be impaired by taxing the road and property used in operating it. The authority to construct and operate the road appears from the agreement of July 18, 1881, between the United States and the Indians, which was ratified by act of congress of July 3, 1882." 116 U. S. 31, 32, 6 Sup. Ct. 246.

The cattle here sought to be taxed, as has been said, were upon the reservation under lease from the Indians, sanctioned by act of congress, and it is impossible to perceive that any of their just rights under the treaty and agreements with them on the part of the United States can be impaired by subjecting complainant's cattle to taxation. In reserving lands for the exclusive and undisturbed use of these Indians, and for others who, with their consent and with that of the United States, should occupy them, it was not the intention of congress to establish an asylum into which persons other than the Indians, whether natural or artificial, can take their property, and hold it exempt from its just portion of the taxation necessary for the support of the government which gives it protection. For the protection of the complainant's cattle in all matters unconnected with the Indians, the authority of the state of Montana is available. In Langford v. Monteith, supra, it was held that where, by treaty, the reservation was not excluded from the limits of the territory, civil process in a suit between white men in a court of the territory may run into the reservation, notwithstanding the Indians themselves are exempt from that jurisdiction. And that the criminal jurisdiction of the state courts extends to crimes in which the Indians have no part, committed upon a similar reservation, was held by the supreme court in U. S. v. McBratney, 104 U. S. 621, and in U. S. v. Kagama, 118 U. S. 375, 383, 6 Sup. Ct. 1109. See, also, U. S. v. Thomas, 151 U. S. 577, 14 Sup. Ct. 426; Torrey v. Baldwin (Wyo.) 26 Pac. 908. The doctrine of these cases sustains, we think, the authority of the state of Montana to tax the cattle in question, and other personal property similarly situated.

As this is the only question presented for decision, the order enjoining the state authorities from proceeding with the collection of the taxes in question is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.