The CROW TRIBE OF INDIANS, Forest Horn, a member of the Crow Tribe and Chairman of the Crow Tribal Council, Ted Hogan, a member of the Crow Tribe and Secretary of the Crow Tribal Council, Jiggs Yellowtail, a member of the Crow Tribe, and Barney Old Coyote, a member of the Crow Tribe, Plaintiffs,

v.

The STATE OF MONTANA, Raymon Dore, Director, Montana Department of Revenue, Margaret Wheeler, Treasurer, Big Horn County, Montana, Betty Whaley, Assessor, Big Horn County, Montana, May Jenkins, Treasurer, Yellowstone County, Montana, Karen Van Haele, Treasurer, Treasure County, Montana, and Bernice Moerkerke, Assessor, Treasure County, Montana, Defendants.

No. 78–110–BLG.

United States District Court,
D. Montana,
Billings Division.

April 3, 1979.

Richard A. Baenen, Edward M. Fogarty, Wilkinson, Cragun & Barker, Washington, D. C., Thomas J. Lynaugh, Lynaugh, Fitzgerald, Schoppert, Skaggs & Essman, Billings, Mont., for plaintiffs.

Helena S. Maclay and Keith C. Rennie, Jurisdiction Project, Missoula, Mont., for State of Montana.

Robert W. Corcoran, Chief Counsel, R. Bruce McGinnis, Deputy Chief Counsel, Montana State Dept. of Revenue, Helena, Mont., for Mont. Dept./Revenue.

James E. Seykora, Hardin, Mont., for Margaret Wheeler.

C. W. Jones, Deputy, Yellowstone County Atty., Billings, Mont., for Jenkins & Tooley.

J. B. Wheatcroft, Treasure County Atty., Hysham, Mont., for Van Haele and Moerkerke.

Harvey Bartle, III, Dechert, Price & Rhoads, Philadelphia, Pa., Bruce L. Ennis, R. H. Bellingham, Moulton, Bellingham, Longo & Mather, Billings, Mont., for defendants in intervention.

## MEMORANDUM OPINION AND ORDER

BATTIN, Chief Judge.

### I. *Background*

The plaintiffs in this case are the Crow Tribe of Indians and several individually named members of the Crow Tribe. The defendants are the State of Montana, Raymon Dore, Director of the Montana Department of Revenue, and the individually named county treasurers and assessors for Big Horn, Yellowstone, and Treasure Counties, all in the District of Montana, and

Westmoreland Resources, Inc., defendant in intervention.

For the purposes of this action, the Crow Reservation must be divided into two distinct legal entities. The Reservation proper consists of that territory granted to the Tribe by the Fort Laramie Treaty of 1851, 11 Stat. 749, II Kappler 594, as reduced by the Fort Laramie Treaty of 1868, 15 Stat. 649, II Kappler 1008, and by the Act of April 11, 1882, 22 Stat. 42, the Act of July 10, 1882, 22 Stat. 157, and by the Indian Appropriation Act of March 3, 1891, 26 Stat. 989. The "ceded area" or "ceded strip" is that area of land consisting of about 1,137,500 acres ceded by the Tribe to the United States in order to open the area to non-Indian entry and settlement, pursuant to the Act of April 27, 1904, 33 Stat. 352.

The surface estate to most of the ceded Crow land was disposed of by the Government pursuant to the provisions of the 1904 Act, but very little of the subsurface estate was ever sold by the Government. Virtually the entire Tribal mineral estate has been preserved and remains in the United States in trust and for the benefit of the Crow Tribe.

Underlying both the Reservation proper and the ceded strip are vast deposits of coal. Since 1967, the Secretary of the Interior and the Commissioner of Indian Affairs (now the Assistant Secretary of the Interior for Indian Affairs), have actively encouraged and approved prospecting permits and mining leases, all of which has brought large scale development of the coal resources underlying both the Reservation and the ceded area very near reality. All mining and prospecting activities initiated to date have been entered into and approved pursuant to the statutory requirements of the Mineral Leasing Act of 1938 [Act of May 11, 1938], 52 Stat. 347 (codified at 25 U.S.C. §§ 396a through 396f), as well as the Department of the Interior regulations under the 1938 Act, 25 C.F.R. part 171 (1977).

To date, only one lessee, Westmoreland Resources, Inc. (hereinafter, "Westmoreland"), has undertaken active mining operations in the area in question. The successful bidder at a 1970 Bureau of Indian Affairs sale of Crow prospecting permits, Westmoreland entered into two mining leases with the Tribe in 1972. Those leases, embracing coal underlying some 30,876.25 acres of land in the ceded area, were amended in 1974 and approved later the same year.

In 1975, the State of Montana enacted a series of statutes, Revised Codes of Montana (1947) (hereinafter, "R.C.M., (1947)"), §§ 84–1312—84–1325 (now, M.C.A. §§ 15–35–101—15–35–109) by which was imposed upon coal mine operators a severance tax on each ton of coal produced in the State and a gross proceeds tax on the sale of each ton of coal produced in the State. Pursuant to the Montana statutes, Westmoreland has paid, since 1975, $17,797,096.62 in severance taxes and $1,707,320 in gross proceeds taxes to the State. In that same period of time, Westmoreland has paid, pursuant to its lease, $5,514,955.06 in royalties, all of which has been paid to the Tribe.

On January 31, 1976, the Crow Tribe enacted its own coal tax code, imposing a severance tax of 25% of the value of coal mined by lessees on the Reservation. The Crow coal tax code was approved as to taxation of coal underlying the Reservation proper, but, on March 3, 1978, was disapproved as to taxation of coal underlying the ceded area.

The Tribe has instituted this action, seeking a declaration that R.C.M., (1947) §§ 84–1312 through 84–1325 are violative of Article I, Section 8, Clause 3 of the Constitution of the United States, as the statutes invalidly impose severance and gross proceeds taxes on Crow coal. The Tribe has further sued for a declaration that the Montana statutes deprive the Tribe of rights secured to it by the Mineral Leasing Act of 1938 and the Treaty of Fort Laramie, and as such are void; for a declaration that the taxes in issue are violative of the due process provisions of the Fourteenth Amendment as well as the civil rights of the individually named plaintiffs and other

members of the Tribe; and for a declaration that the State taxes impede Tribal self-government and are preempted by the Tribal ordinance imposing a severance tax on coal. Finally, the plaintiffs seek an injunction preventing the further imposition, assessment, or collection of coal severance or coal gross proceeds taxes by the defendant State of Montana.

The plaintiffs moved for, and were granted, leave to file a second amended complaint. The gravamen of the second amended complaint is that the State taxes, when imposed in conjunction with Tribal taxes, may raise the cost of producing coal under a Tribal lease to the point of economic unfeasability, with the ultimate result that coal underlying Reservation and ceded lands may suffer from non-development. In essence, the State taxation is alleged to have:

(i) Illegally subjected the property of the sovereign Crow Tribe to an unauthorized state tax, in violation and/or derogation of Article I, Section 8, Clause 3 of the United States Constitution; the Mineral Leasing Act of 1938, as amended [citation omitted], and the Act of May 17, 1968 [citation omitted]; and the Fort Laramie Treaty of May 7, 1868 [citation omitted];

(ii) Illegally reduced the ability of the sovereign Crow Tribe and its members to realize full benefit, use and development of their land, thereby depriving them of liberty and property without due process of law, in violation of the Fourteenth Amendment of the United States Constitution and of the Tribe's civil rights and the civil rights of its members;

(iii) Illegally threatened the ability of the sovereign Crow Tribe to exercise its sovereignty through its lawful tribal tax;

(iv) Illegally and severely infringed upon the right and ability of the sovereign Crow Tribe to govern itself and its people; and

(v) Illegally and severely impaired the ability of the sovereign Crow Tribe to serve its people through its various tribal programs and governmental services, including but not limited to its vitally important land repurchase program, its tribal cultural and historical program, its tribal educational program and its reservation maintenance services.

The State of Montana has moved to dismiss the second amended complaint on three grounds:

(1) The State has moved to dismiss the claims of the Tribe on the grounds that the second amended complaint fails to state a claim upon which relief may be granted.

(2) The individually named defendants, Whaley, Tooley, and Moerkerke, have moved to dismiss on the grounds that as to them the second amended complaint fails to state a claim upon which relief may be granted.

(3) The State of Montana has moved to dismiss the claims of the individually named plaintiffs, Horn, Hogan, Yellowtail, and Old Coyote, on the grounds that the Court lacks subject matter jurisdiction over their claims.

As the plaintiffs have conceded that the position of the individually named defendants is well taken, and as the plaintiffs do not object to dismissal of the second amended complaint as to those defendants, there remain only two grounds to be addressed in considering defendants' motion to dismiss.

II. *State of Montana's Motion to Dismiss For Failure to State a Claim.*

The plaintiffs have argued specifically, in opposition to the State's motion to dismiss, that the complaint in issue states a claim for the following reasons:

A) The Montana coal severance tax and gross proceeds tax are without Congressional authorization;

B) The Montana coal severance tax and gross proceeds tax impair the plaintiffs' right to self-government;

C) The Montana coal severance tax and gross proceeds tax are preempted by

federal law and by the Crow tribal coal tax.

D) The Montana coal severance tax and gross proceeds tax are violative of the State's Enabling Act and Constitution.

Upon consideration of each of plaintiffs' arguments, it is evident that, on its motion to dismiss, the State of Montana must prevail.

### A. *Congressional Authorization of the Montana Coal Severance and Gross Proceeds Taxes.*

■ In arguing that the taxes in issue are unconstitutional as applied to the coal underlying both the Reservation proper and the ceded strip, the plaintiffs have first advanced the argument that the State of Montana lacked the necessary Congressional authority to enact the taxing statutes. The bulwark of plaintiffs' argument in this regard is that Article I, Section 8, Clause 3 of the Constitution, which vests in Congress the exclusive authority "[t]o regulate Commerce . . . with the Indian Tribes", and the case law construing it, prohibit the State taxation here in issue. In analyzing plaintiffs' argument concerning the necessity of Congressional authorization, the major premise of the Tribe's argument is shown to be that, in the absence of express congressional authorization, the states are powerless to control or regulate Indian tribes or tribal trust lands. The plaintiffs rely heavily on *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). In that case it was held that:

> [I]n the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, and *McClanahan v. Arizona State Tax Comm'n* [411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129], [State Tax Commission of Arizona] *supra,* lays to rest any doubt in this respect by holding that such taxation is not permissible absent congressional consent. *Mescalero Apache Tribe v. Jones,* 411 U.S. at 148, 93 S.Ct. at 1270.

In urging *Jones* as authority for their position that congressional approval is required in order for the State taxes here in issue to be properly levied, the plaintiffs overlook two things. First, the holding of *Jones,* in which the State of New Mexico was found to have the power to impose a nondiscriminatory gross receipts tax on a ski resort operated by the tribe on off-reservation land, is substantially broader than plaintiffs have indicated. In that case, the Court stated further:

> At the outset, we reject—as did the state court—the broad assertion that the Federal Government has exclusive jurisdiction over the Tribe for all purposes and that the State is therefore prohibited from enforcing its revenue laws against any tribal enterprise "[w]hether the enterprise is located on or off tribal land." *Jones,* 411 U.S. at 147, 93 S.Ct. at 1270.

The Court further stated that, in light of New Mexico's Enabling Act:

> It is thus clear that in terms of general power New Mexico retained the right to tax, unless Congress forbade it, all Indian land and Indian activities located [on] or occurring "outside of an Indian reservation." 411 U.S. at 149–150, 93 S.Ct. at 1271.

The *Jones* case is not, as plaintiffs urge, a broad prohibition of State taxation, but rather, is limited to a prohibition of taxation by the states of land utilized by a tribe or tribal enterprise pursuant to Section 5 of the Indian Reorganization Act, 25 U.S.C. § 465. In *Jones,* it is further stated that:

> Section 465 provides, in part, that "any lands or rights acquired" pursuant to any provision of the Act "shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation." [Footnote omitted.] On its face, the statute exempts land and rights in land, not income derived from its use. It is true that a statutory tax exemption for "lands" may, in light of its

context and purposes, be construed to support an exemption for taxation on income derived from the land. [Citations omitted.] But, absent clear statutory guidance, courts ordinarily will not imply tax exemptions and will not exempt off-reservation income from tax simply because the land from which it is derived, or its other source, is itself exempt from tax. 411 U.S. at 155–156, 93 S.Ct. at 1274.

The second misconception nurtured by the plaintiffs throughout their argument is the assertion that the taxes here in issue are imposed upon the Tribe or upon tribal trust land. The Montana statutes imposing the tax in issue are R.C.M. (1947) §§ 84–1314 and 84–1320–1322. Section 1314 provides:

A severance tax is imposed upon each ton of coal produced in the state, in accordance with the following schedule: . . . A person is not liable for any severance tax upon 20,000 tons of the coal he produces in a calendar year.

Under Section 1313, "produced" means "severed from the earth." Section 1320 provides:

Each person engaged in mining coal must, on or before March 31 each year, file with the department of revenue a statement of the gross yield from each coal mine owned or worked by such person in the proceeding calendar year and the value thereof. . . .

It is upon the basis of the report provided pursuant to § 1320 that the coal gross proceeds tax is levied.

It is evident from a reading of the taxing statutes that neither operates as a tax upon the Tribe, tribal trust lands, or the income of individual members of the Tribe. Rather, each tax is imposed upon the operators of coal mines—in this case, Westmoreland. The plaintiffs argue that, as the severance tax is imposed upon the coal, it is imposed upon a tribal trust estate. This argument must fail. Neither tax is imposed until such time as the coal has been severed from the leased realty, upon which occurrence the coal becomes the personalty of the mine operator.

The plaintiffs have not seriously contended that the State of Montana has no power to regulate Westmoreland's operations, be they on reservation or off reservation in location. It is well settled that Montana may tax the property and receipts of Westmoreland and other non-Indian entities within the exterior boundaries of the State of Montana, whether on tribal trust land or not, *Thomas v. Gay*, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898), *Oklahoma Tax Comm'n v. Texas Co.*, 336 U.S. 342, 69 S.Ct. 561, 93 L.Ed. 721 (1949), and congressional authorization is not required in order for the State to exercise its sovereignty.

The question of whether the Tribe, were it a mine operator, would be subject to State taxation upon coal produced on the reservation, or whether the Tribe would enjoy an immunity from State taxation is not properly before the Court at this time. However, even were the Tribe ultimately found to enjoy an immunity from State taxation of coal production, it is well settled that a non-Indian lessee of the Tribe would not share in that immunity. As the plaintiffs themselves have stated in their brief, the Mineral Leasing Act is silent on the question of taxing authority and tax immunity. Absent express statutory exemption from taxation, no such exemption may be inferred.

This Court has repeatedly said that tax exemptions are not granted by implication. . . . It has applied that rule to taxing acts affecting Indians as to all others. . . . If Congress intends to prevent the State of Oklahoma from levying a general non-discriminatory estate tax applying alike to all its citizens, it should say so in plain words. Such a conclusion cannot rest on dubious inferences. *Oklahoma Tax Comm'n v. United States*, 319 U.S. 598, at 606–607, 63 S.Ct. 1284, at 1288, 87 L.Ed. 1612 (1943)

There are no allegations in the complaint that the taxes in issue violate a specific congressional prohibition of such taxation, or that they are discriminatory in effect. The only allegations plaintiffs offer are

that the taxes are levied against "Crow coal", and that because the taxes are imposed against Indian or tribal realty, they must have the approval of Congress as a condition precedent to their validity. The plaintiffs' argument is clearly erroneous. The taxes in issue are levied against a non-Indian mine operator, as taxes upon personalty and income. The argument that such an obviously proper exercise of State sovereignty somehow requires prior congressional approval is without merit.

Conceptually, two relationships exist among the parties to this dispute. The Tribe, with the approval of the Secretary of the Interior and under the aegis of the Mineral Leasing Act of 1938, has entered into a mineral lease agreement with Westmoreland. That agreement has been reached in the proper procedural manner, with both parties following the administrative guidelines established by Congress and the Department of the Interior. No claim has been made by any party that the leases themselves were entered into without congressional authority or consent, and, by the admission of each party, such a claim could not properly be raised.

The second relationship in this dispute is that between Westmoreland and the State of Montana. By doing business within the State, Westmoreland has voluntarily subjected itself to the laws of the State, including those laws governing taxation. Although Montana may require congressional authorization to tax the Tribe or individual Indians on their income, as a result of congressionally established immunity from such taxation, it cannot be said that a non-Indian lessee of the Tribe stands in the same relationship to the State as the Tribe itself. Clearly, the State of Montana need not secure the prior approval of Congress in order to tax a non-Indian enterprise doing business within the boundaries of the State. As was stated by the Supreme Court, in an opinion considering the relationship of a non-Indian lessee of Indian land to the State of Oklahoma:

> We do not imply, by this decision, that Congress does not have power to immunize these lessees from the taxes we think

the Constitution permits Oklahoma to impose in the absence of such action. [Footnote omitted.] The question whether immunity shall be extended in situations like these is essentially legislative in character. But Congress has not created an immunity here by affirmative action, [footnote omitted] and "The immunity formerly said to rest on constitutional implication cannot now be resurrected in the form of statutory implication." [Citations omitted.] ". . . if it appears that there is no ground for implying a constitutional immunity, there is equally a want of any ground for assuming any purpose on the part of Congress to create an immunity." *Oklahoma Tax Comm'n v. Texas Co.,* 336 U.S. 342, 365–366, 69 S.Ct. 561, 574, 93 L.Ed. 721 (1949).

No congressional enactment conferring state tax immunity upon lessees of Indian minerals has been cited by counsel, and we are aware of none. Further, that the Indian Reorganization Act has no bearing on Westmoreland's tax obligation to the State of Montana is made plain by *Fort Mojave Tribe v. County of San Bernardino,* 543 F.2d 1253 (9th Cir. 1976). In that case the Ninth Circuit held that "[w]e . . . refuse to find that the [Indian Reorganization] Act created a tax exemption for non-Indian lessees of Indian land." 543 F.2d at 1256. Further,

> When the state action is directed at non-Indians, with only indirect effects on Indians or Indian lands, it is necessary to reconcile the federal preemption rationale with the state's recognized authority to regulate its citizens. [Citation omitted.] Reconciliation requires that state legislation primarily directed at non-Indian lessees of Indian land be considered as not automatically preempted by the federal government in the absence of specific authorization. [Citations omitted.] To permit such non-Indians to enjoy the immunity designed for Indians requires, we believe, a stronger Congressional signal than a statute which neither precludes nor authorizes the taxation in question. 543 F.2d at 1257.

Absent a specific congressional mandate to the contrary, Montana has the power, in its sovereign capacity, to tax a non-Indian enterprise within its boundaries, even if the situs of the enterprise is within the exterior boundaries of an Indian reservation. This power is freely exercisable by the State without consent or authorization of Congress. Clearly, no affirmative congressional authority exists for the Montana taxing statutes here in issue, for none is needed.

## B. *Interference With Tribal Self-Government.*

█ It is the plaintiffs' contention with respect to the issue of whether the State taxes impede or impair tribal self-government that both because the economic effects of the tax fall upon the Tribe and because the Tribe is economically restrained from either receiving greater royalties or imposing its own tax upon coal production, the taxes in issue run afoul of the protection of tribal self-government affirmed in *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), and the cases following it. The test established by *Williams* for whether a state law impairs tribal self-government, and is hence subject to attack, has been stated as:

> Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be [governed] by them. *Williams,* 358 U.S. at 220, 79 S.Ct. at 271.

And further:

> [I]f a tribe has proved and/or a state concedes that the state [statute] causes an actual interference with the performance of the [tribe's] governmental obligations, the courts must, consistent with *Williams,* strike the [statute] down. *Confederated Tribes of Colville Reservation v. Washington,* 446 F.Supp. 1339, 1363–1364 (E.D.Wash.1978).

The Tribe rests its allegations of interference with self-government upon the relative economic benefits realized by the State and the Tribe as a result of Westmoreland's mining operations. The Tribe contends that because the State derives more revenue through its taxation of Westmoreland's operations than does the Tribe through its royalty agreement with Westmoreland, tribal self-government is greatly impaired. However, the fact remains that the lease agreements between the Tribe and Westmoreland were freely and voluntarily entered into by both parties and approved administratively. The royalty to be paid by Westmoreland upon the coal produced pursuant to the lease must be assumed to have been a point of negotiation. As with any arm's length transaction, the Tribe was free either to accept or reject the terms offered by Westmoreland. In other words, the revenue received by the Tribe as a result of Westmoreland's operations is not, as plaintiffs argue, a result of State taxation; rather, it is a product of the Tribe's own bargaining at the time the leases were entered into by both parties.

The plaintiffs have further argued that the State taxes interfere with the Tribe's ability to control the scope and timing of development of its coal resources, and that such an interference is contrary to the protection accorded Indian tribes by *Williams v. Lee* and *Santa Rosa Band of Indians v. Kings County,* 532 F.2d 655 (9th Cir. 1975), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1976). The plaintiffs cite *Santa Rosa* for the proposition that

> . . . tribal use and development of tribal trust property presently is one of the main vehicles for the economic self-development necessary to equal Indian participation in American life. Extension of local jurisdiction to the reservation would burden that development by increasing its cost. . . . But more critically, subjecting the reservation to local jurisdiction would dilute if not altogether eliminate Indian political control of the timing and scope of the development of reservation resources . . . . *Santa Rosa,* 532 F.2d at 664.

It must be borne in mind, however, in considering the impact of authority such as *Santa Rosa* upon resolution of the instant case that there is a distinct factual dissimi-

larity between the two cases. In *Santa Rosa,* an Indian tribe and two of its members brought an action for declaratory and injunctive relief to restrain enforcement of certain county ordinances. The district court granted the requested relief, and the county appealed. The Court of Appeals held that the county was without jurisdiction to enforce its zoning ordinances or building code on Indian reservation trust land, and that the courts must determine on a case-by-case basis when concrete disputes arise whether a county has jurisdiction to enforce any particular ordinance against Indian reservation or trust land. In so holding, the Court of Appeals stated:

At the outset, we emphasize that this suit involves an attempt to regulate Indian use of Indian trust lands. We are clear, regardless of the modification worked in the exclusive Federal jurisdiction and tribal sovereignty doctrines of *Worcester v. Georgia,* 31 U.S. (6 Pet. 515) 350, 8 L.Ed. 483 (1832), by subsequent Court decisions such as *Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962) and *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), that in any event any concurrent jurisdiction the states might inherently have possessed to regulate Indian use of reservation lands has long ago been preempted by extensive Federal policy and legislation. *Santa Rosa,* 532 F.2d at 658.

The essential question addressed by the Court in *Santa Rosa* was one involving construction of Public Law 280, 28 U.S.C. § 1360, which vests in certain enumerated states civil jurisdiction over certain enumerated tribes. The Court of Appeals held, in essence, that Public Law 280 subjected Indian country only to the civil laws of the state and not to local (county) regulation. In so holding the Court stated that:

From that perspective, we conclude that Congress did not contemplate immediate transfer to local governments of civil regulatory control over reservations. Prior to passage of P.L. 280, Congress had encouraged, under § 476 of the Indian Reorganization Act, the formation and exercise of tribal self-government on reservation trust lands. A construction of P.L. 280 conferring jurisdiction to local county and municipal governments would significantly undermine, if not destroy, such tribal self-government. By transferring regulation of all matters of local concern to local governments, the tribal government would be left little or no scope to operate. We think it more plausible that Congress had in mind a distribution of jurisdiction which would make the tribal government over the reservation more or less the equivalent of a county or local government in other areas within the state, empowered, subject to the paramount provisions of state law, to regulate matters of local concern within the area of its jurisdiction. *Santa Rosa,* 532 F.2d at 662–663.

It must be borne in mind in considering the holding of *Santa Rosa* that the local governmental controls being attacked in the case were zoning controls imposed by the defendant, Kings County. It must also be borne in mind that the reservation had, by virtue of Public Law 280, already been totally subjected to the jurisdiction of the *State* of California. The distinction between *Santa Rosa* and the instant case is obvious; the contrast of local governmental zoning control over Indian housing on Indian trust land to state taxation of a non-Indian enterprise on land that has been ceded by the Crow Tribe to the United States reveals that on the facts alone, *Santa Rosa* is inapplicable in this case. As a matter of law, the remote economic effect to the Tribe of Montana's taxation of Westmoreland's production and income arising out of operation under tribal coal leases—economic effect which is so remote as to have thus far evaded definition—is insufficient to constitute an interference with Crow tribal self-government.

## C. *Preemption.*

■ Intertwined with their argument that the taxes in issue impermissibly interfere with tribal self-government is plaintiffs' claim that the State taxes have been

preempted by the Crow tribal coal tax. In so arguing they allege that the Montana taxes conflict with the taxes imposed by the Tribe, serving to reduce the amount of revenue the Tribe is able to receive as a result of Westmoreland's production. The Montana taxes, the plaintiffs argue, run afoul of the holding in *Warren Trading Post v. Arizona Tax Commission*, 380 U.S. 685, 691, 85 S.Ct. 1242, 1246, 14 L.Ed.2d 165 (1965), wherein it was stated that a

> . . . state tax on gross income would put financial burdens on [the non-Indian trader] or the Indians with whom it deals in addition to those Congress or the tribes have prescribed, and could thereby disturb and disarrange the statutory plan Congress set up in order to protect Indians . . . .

However, the question of preemption raised by the plaintiffs in this case is quite different from the question addressed by the Court in *Warren Trading Post.* In that case the appellant, an operator of a retail trading post on the Navajo Indian Reservation, under a license granted by the Commissioner of Indian Affairs pursuant to 25 U.S.C. § 261, challenged the right of Arizona to levy a tax on his income from trading with reservation Indians on the Reservation. The Supreme Court, in invalidating Arizona's tax, held that since Congress had broadly occupied the field of trading with Indians on reservations by all-inclusive regulations and statutes, the states may not permissibly impose additional burdens on the traders or the Indians. In speaking about the federal regulatory framework by which Indian traders are governed, the Court said:

> [T]hese apparently all-inclusive regulations and the statutes authorizing them would seem in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders. *Warren Trading Post*, 380 U.S. at 690, 85 S.Ct. at 1245.

In the instant case, however, there is no body of federal law either governing the method by which coal underlying reservation lands is to be taxed or immunizing non-Indian lessees from the application of state law. A Ninth Circuit case, *Fort Mojave Tribe v. County of San Bernardino*, 543 F.2d 1253 (9th Cir. 1976), is instructive upon the application of the doctrine of preemption to taxation of non-Indian lessees of Indian trust land. In that case, appeal was taken from the judgment of the United States District Court for the Central District of California, upholding a possessory interest tax imposed by the defendant County on non-Indian lessees of land held in trust for the Fort Mojave Indian Tribe. The Court of Appeals held that imposition of possessory interest taxes on non-Indian lessees did not violate the Indian Reorganization Act, and was not invalid as being an infringement upon the Tribe's right to govern itself. Further, it was held that imposition of possessory interest taxes by both the Fort Mojave Indian Tribe and San Bernardino County on non-Indian lessees of Indian land did not result in improper double taxation. The essence of the *Fort Mojave* decision was that the concept of Indian sovereignty is no longer the proper major focus of analysis in taxing situations. Rather, the inquiry is one involving analysis of the applicable federal statutes to determine whether state action has been preempted. If not, the state statute need only satisfy the test laid down in *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1958), which is that it not infringe on the rights of reservation Indians to make their own laws and be governed by them. Federal statutes clearly have not preempted the area of a state's taxation of coal produced within its exterior boundaries, even if that coal lies under Indian Reservation lands. The Mineral Leasing Act, as well as the other federal statutes governing lease by the Crow Tribe of the coal estate in question, is silent as to taxation. The Tribe is not, of course, prevented from enacting taxing measures of their own, which, to a certain degree, has already been done. Should the Tribe do so, however, the mere enactment of a tribal taxing statute would not preempt the state statute taxing the same subject matter. As

was stated by the Court in *Fort Mojave*, in considering the problem of taxation of the same subject matter by both the County and the Tribe:

> The assertion that "double taxation," resulting from the imposition of a tax both by the county and the tribe, impairs the ability of the tribe to levy its tax is not persuasive. There is no improper double taxation here at all, for the taxes are being imposed by two different and distinct taxing authorities. The tribe faces the same problem as other taxing agencies confront when they seek to impose a tax in an area already taxed by another entity having taxing power. We hold that the uncertain economic burden here imposed on the tribe's ability to levy a tax does not interfere with their right of self-government. *Fort Mojave*, 543 F.2d at 1258.

Most persuasive on the issue of preemption, however, is a close analysis of the present effect of the Crow Tribe's coal tax. As the plaintiffs have indicated in their memoranda to the Court, the Tribe has adopted and approved a coal severance tax upon coal produced from beneath the Reservation trust lands. No gross proceeds tax has been enacted by the Tribe. At present, the only mining being done is that of coal underlying the ceded strip. By the plaintiffs' own admission the tribal taxing statutes do not affect mining in the ceded area. The simple fact is that the Crow Tribe, although possessing a certain measure of taxing power, has as yet taxed no one, and no one has as yet been taxed by both the tribe and the State upon production of or proceeds from coal. It is therefore apparent that plaintiffs' claim that the Montana taxing statutes here in issue have been preempted by federal statutes as well as the Crow Tribal coal tax is without merit.

### D. *Enabling Act and Constitutional Claims.*

■ Section 4 of the Enabling Act pursuant to which Montana was admitted to the Union provides:

> That the people inhabiting said proposed states do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States . . . . Enabling Act of February 22, 1899, 25 Stat. 676.

The Constitution adopted and ratified by the people of Montana in 1889 pursuant to the Enabling Act recognized and accepted the limitation upon the State's power to tax. Ordinance No. I to the 1889 Constitution of the State of Montana provided:

> Second. That the people inhabiting the said proposed state of Montana, do agree and declare that they forever disclaim all right and title to . . . all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States . . . . Montana Constitution, Ord. I, 2 (1889).

The same disclaimer is expressly reaffirmed by and incorporated in Article I of the Montana Constitution of 1972.

Upon the basis of the disclaimer of jurisdiction appearing in both the Enabling Act and the Constitution, the plaintiffs contend that the State is without authority to enact, let alone assess the taxes contemplated by R.C.M., (1947) §§ 84–1312 through 84–1325. Plaintiffs' argument in this connection suffers the same failing, however, as did their argument that the taxes in issue lack congressional authority. Plaintiffs, in arguing that the Montana coal severance tax and Montana coal gross proceeds tax are violative of both the Constitution and Enabling

Act of the State, are arguing from the position that the taxes are levied against either the Tribe or tribal trust land. That contention has previously been expressly rejected. Plainly, the taxes in issue are imposed upon the production and income of non-Indian coal mine operators. The taxes levied are levied upon personalty. In distinguishing between taxation of Indians or Indian realty and personalty found upon the reservation in the possession of a third party, the Ninth Circuit stated, in *Truscott v. Hurlbut Land and Cattle Co.*, 73 F. 60 (9th Cir. 1896):

> The people inhabiting the proposed state [of Montana] were required by congress to agree, and did agree, as one of the conditions to its admission into the Union, to disclaim any right or title to all lands lying within the limits of the proposed state owned or held by any Indian or Indian tribes, and that, until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and under the absolute jurisdiction and control of congress. The people inhabiting the proposed state were required to make, and did make, as one of the conditions of its admission into the Union, a similar disclaimer in respect to all right and title to the unappropriated public lands lying within its boundaries. Those, too, remained in the absolute jurisdiction and control of congress for all purposes relating to their control or disposition. The state could not tax or incumber such unappropriated public lands, or otherwise interfere with the jurisdiction and control over them reserved by the United States, *but no one, we apprehend, would contend that personal property taken upon them by a third party, whether rightfully or wrongfully, would not be liable to be taxed in the state and county in which it should be found.* *Truscott*, 73 F. at 64 (emphasis added).

The *Truscott* Court went on further to say that:

> In reserving lands for the exclusive and undisturbed use of these Indians and for others who, with their consent and with that of the United States, should occupy them, it was not the intention of congress to establish an asylum into which persons other than the Indians, whether natural or artificial, can take their property, and hold it exempt from its just portion of the taxation necessary for the support of the government which gives it protection. *Truscott*, 73 F. at 65.

As the taxes in issue are assessed solely against Westmoreland, a non-Indian entity, and are in fact assessed solely against Westmoreland's personalty—severed coal and gross proceeds from coal—it is inconceivable that any infringement upon Indian rights has been worked, or that any abridgement of either the Enabling Act or the Montana Constitution has occurred. Montana has in no way exceeded its sovereign powers in either legislating or assessing the coal severance and gross proceeds from coal taxes. To strike down the taxes in issue would be to extend to Westmoreland an immunity from State law which is antithetical to both the letter and the trend of the law concerning State jurisdiction over Indian reservations. To work such a drastic alteration requires exercise of legislative, and not judicial, discretion. The result sought by plaintiffs is one that Congress, and not the Courts, must give them.

From the foregoing, it is evident that plaintiffs can prove no set of facts in support of any of their four enumerated claims which would entitle them to the requested relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). As plaintiffs' claims are without basis either in fact or in law, they are insufficient to survive the State of Montana's motion to dismiss. The motion to dismiss the second amended complaint for failure to state a claim is meritorious, and must be granted.

III. *Motion to Dismiss the Claims of the Individually Named Plaintiffs for Want of Subject Matter Jurisdiction*

■ By this motion the State seeks to dismiss the claims of the individually named plaintiffs, Horn, Hogan, Yellowtail, and Old

Coyote, for want of jurisdiction. The individually named plaintiffs have brought their claims pursuant to 28 U.S.C. §§ 1331 and 1343.

Section 1331 recites that:

(a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States.

The Second Amended Complaint recites, in paragraph 1, that the amount in controversy exceeds, exclusive of interest and costs, $10,000. No allegation appears in the complaint that the amount in controversy as to each plaintiff exceeds the jurisdictional amount of $10,000. It is well settled that in an action in which jurisdiction is invoked pursuant to 28 U.S.C. § 1331, each plaintiff must not only allege but also be able to meet the jurisdictional amount requirement. *Zahn v. International Paper Co.*, 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). It is essential that each of the individual plaintiffs properly plead the amount in controversy prior to this Court's recognizing its jurisdiction. The value of the matter in controversy must be measured not by the importance of the principle involved, but by the monetary value of the right sought to be gained. *Yoder v. Assiniboine & Sioux Tribes*, 339 F.2d 360 (9th Cir. 1964). Here, the matter sought to be gained is immunity for lessees of the Tribe from the coal severance and coal gross proceeds taxes. The principal allegation as to value supporting the plaintiffs' claim is that the Tribe, and not the individual plaintiffs, would be in a better bargaining position for the negotiation of coal leases if Montana were enjoined from imposing its taxes upon Crow tribal lessees. The monetary benefits sought here to be gained accrue solely to the Tribe; as such, any right or matter in controversy accruing to the individual plaintiffs is necessarily based upon a theory that each has a right to share in any benefits accruing to the Tribe. It is evident, however, that individual members of the Tribe cannot claim, as a matter of right, any specific portion of tribal benefits for themselves.

In the absence of legislation to the contrary, the individual Indian has no right as against the tribe to any specific part of the tribal property. It is often said that the individual has only a "prospective right" to future income from tribal property in which he has no present interest . . . . Until the property loses its tribal character and becomes individualized, his right can be no more than this . . . . In the case of tribal funds, he has, ordinarily, no vested right in them until they have been paid over to him or have been set over to his credit. . . . .
Felix Cohen, *Handbook of Federal Indian Law*, 183–184 (1942).

It is evident that the individually named plaintiffs have no economic interest or matter in controversy sufficiently detached from the general economic injury alleged by the Tribe such that they are entitled to invoke this Court's federal question jurisdiction under § 1331. Further, as no specific allegations of amount in controversy appear as to each plaintiff, this Court is without subject matter jurisdiction over the claims of Horn, Hogan, Yellowtail, and Old Coyote under the provisions of 28 U.S.C. § 1343(3). That section provides that:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

.    .    .    .    .

(3) To redress the deprivation, under the color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

Jurisdiction under § 1343(3) does not turn upon satisfaction of a minimum amount-in-controversy requirement. *Lynch v. Household Finance Corp.*, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972).

The defendants argue that 28 U.S.C. § 1341 is a bar to this Court's jurisdiction under § 1343. Section 1341 states:

The District Courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

The plaintiffs have argued, and correctly so, citing *Confederated Salish and Kootenai Tribes v. Moe*, 392 F.Supp. 1297 (D.Mont. 1974), aff'd 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), that

.   .   . the exception [from the bar of 1341] applies even where, as here, the United States is not a party plaintiff, if the suit could have been brought by the United States and is in fact brought by parties who could properly be co-plaintiffs with the United States.   .   .   . *Moe*, 392 F.Supp. at 1302.

However, the only challenge to the Montana taxes offered by the individual plaintiffs is that the taxes constitute a violation of their civil rights. Although § 1341 does not bar the claims of the Tribe, *Moe, supra,* it bars jurisdiction even when the Court could have accepted jurisdiction pursuant to 42 U.S.C. § 1983 (civil rights violations), 28 U.S.C. §§ 1343 and 1331. *Bland v. McHann*, 463 F.2d 21 (5th Cir. 1972), *cert. denied*, 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (1973); *Gray v. Morgan*, 371 F.2d 172 (7th Cir. 1966), *cert. denied*, 386 U.S. 1033, 87 S.Ct. 1484, 18 L.Ed.2d 596 (1967). The individually named plaintiffs' complaint, as based upon a federal question or alleged violations of their civil rights, does not avoid the jurisdictional prohibition contained in 28 U.S.C. § 1341. *Hickmann v. Wujick*, 488 F.2d 875 (2nd Cir. 1973). It is evident that the State of Montana's motion to dismiss the claims of the individually named plaintiffs for want of subject matter jurisdiction is well taken.

On the basis of the foregoing,

IT IS ORDERED that the State of Montana's motion to dismiss the Second Amended Complaint for failure to state a claim upon which relief may be granted be, and the same hereby is, granted.

IT IS FURTHER ORDERED that the State of Montana's motion to dismiss the claims of the individually named plaintiffs, Horn, Hogan, Yellowtail, and Old Coyote, for want of subject matter jurisdiction be, and the same hereby is, granted.

The Clerk is directed to enter judgment by separate document in accordance with this memorandum opinion and order.